# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT, ET AL,    :
                Plaintiffs,    :         NO. 3:05CV1330(MRK)
                          :
v.                            :
                          :
MARGARET SPELLINGS, SECRETARY  :
OF EDUCATION                  :
                Defendant.    :

## MEMORANDUM OF DECISION

This case arises from a dispute between the State of Connecticut and the U.S. Secretary of Education over each other's obligations under the No Child Left Behind Act of 2001, Pub. L. 107-110, codified at 20 U.S.C. §§ 6301-7941 (the "Act").  Although the State and the Secretary have fundamental, important, and bona fide disagreements about the interpretation and implementation of the Act, they are united in affirming its basic goal of seeking to improve the education of our Nation's children.  Indeed, the State expressly disclaims any intent to challenge the Act itself.  Moreover, the State is currently in compliance with the Secretary's interpretation of the State's obligations under the Act.

In this case, the State challenges the Secretary's interpretation of several key elements of the Act.  In particular, the State asks the Court to clarify the meaning of the so-called "Unfunded Mandates Provision" of the Act, 20 U.S.C. § 7907(a), and to declare that the Secretary's interpretation of that provision is contrary to its plain language and Congress's intent in enacting it. In addition, the State seeks a ruling that the Secretary's implementation of the Act violates both the Spending Clause of the United States Constitution and the Tenth Amendment.  Finally, the State

1

alleges that the Secretary violated the Administrative Procedures Act (the "APA"), 5 U.S.C. §§ 701-706, by denying the State's requests for waivers from the Act's requirements and also by denying certain plan amendments submitted by the State.

On the merits, the Secretary disputes the State's interpretation of the Unfunded Mandates Provision and asserts that all of her actions are in accordance with the express terms of the Act. However, the Secretary also raises a number of threshold concerns, including whether this Court lacks jurisdiction to hear this pre-enforcement challenge to the Secretary's interpretation of the Act, whether the State lacks standing to assert its claims, whether the claims themselves are even ripe, and finally, whether the Secretary's denials of the State's waiver requests are decisions "committed to the agency" and thus not subject to judicial review under the APA.  For these reasons, the Secretary filed a Motion to Dismiss [doc. # 18] asserting under Rule 12(b)(1) of the *Federal Rules of Civil Procedure* that the Court lacks jurisdiction to hear the State's claims; the Secretary also argues under Rule 12(b)(6) that the State has failed to state an adequate legal claim.  Both parties have submitted truly superb briefing and argument on the difficult issues presented by this case.  The Court is most grateful to counsel for their professionalism and skill in presenting their positions to the Court.

In this ruling, the Court addresses only the threshold issues relating to its jurisdiction and authority to consider the various claims raised by the State, since the Court concludes that any consideration of the merits of either party's statutory arguments would require further development of the record.  Thus, nothing in this ruling should be read as indicating the Court's views about the merit (or lack of merit) in the State's or the Secretary's underlying arguments about the scope and interpretation of the substantive provisions of the Act.   Instead, this decision is all about whether,

how, and when the State may present its underlying arguments about the Act to a court.

The "whether, how, and when" are nonetheless critical questions for several reasons.  For one, the lower federal courts are courts of limited jurisdiction, and the scope of that jurisdiction is determined by Congress.  As the Supreme Court famously remarked in *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850), "[c]ourts created by statute can have no jurisdiction but such as the statute confers."  For another, the Constitution establishes certain rules regarding who can assert claims and when claims can be asserted in order to ensure that courts are not called upon to resolve abstract questions or provide advisory opinions but instead confine themselves to deciding concrete cases or controversies involving parties who are actually threatened with a real injury that a court decision is likely to remedy.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  For over a year now, the political branches of the State and the federal Government have sparred over their competing interpretations of the Act and its implications for Connecticut.  While both parties have engaged in substantial negotiation, posturing and even legal briefing, there has been significantly less concrete action.  Finally, courts have wisely developed important prudential rules to ensure that they exercise restraint and do not unnecessarily inject themselves into disputes committed to the other branches of Government or before the time at which judicial action is required.

Each of the foregoing restrictions on judicial authority is "founded in concern about the proper–and properly limited role–of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  As explained in more detail below, after careful thought and consideration, the Court has decided that it lacks jurisdiction over most of the State's claims, though one claim will remain pending after this ruling.

## I.

The procedural history of this case is as follows.  On August 22, 2005, the State filed a three-count Complaint [doc. # 1] against the Secretary regarding the Secretary's interpretation and implementation of the Act.  The Secretary moved to dismiss the Complaint on December 22, 2005, asserting lack of jurisdiction and other grounds.  *See* Motion to Dismiss [doc. # 18].  Following briefing, the Court heard over four hours of oral argument on the Secretary's Motion to Dismiss on January 31, 2006.  Underscoring the importance of this case to the State, the Connecticut Attorney General personally argued the motion.  At argument, the parties agreed that the State should have an opportunity to amend its Complaint to respond to several concerns expressed by the Secretary and the Court.  The parties and the Court also agreed that the Secretary's Motion to Dismiss would apply to any amended complaint filed by the State.  *See* Order [doc. # 36] ("Secretary Spellings' Motion to Dismiss [doc. #18] will be deemed to apply to any amended complaint the State may file.").  The State filed an Amended Complaint [doc. # 43] on February 28, 2006.  Another round of briefing ensued, with additional oral argument by way of an on-the-record telephonic conference on April 28, 2006.  *See* Defendant's Memorandum Regarding Amended Complaint [doc. # 50]; Minute Entry [doc. # 59]; State's Supplemental Brief on Matters Raised During the April 28, 2006 Oral Argument [doc. # 64]; Defendant's Memorandum Regarding Issues Raised at April 28, 2006 Conference [doc. # 65].

During the April 28, 2006 supplementary oral argument, and in response to allegations in the State's Amended Complaint, the Secretary offered an interpretation of a key provision of the Act that prompted the State to request leave to amend its Complaint for a second time, in order to add a fourth count under the APA relating to the Secretary's rejection of the State's plan amendments.

4

After briefing on the propriety of further amendment, the Court granted the State's Motion for Leave to File Second Amended Complaint [doc. # 72]. *See* Ruling and Order [doc. # 80]. The State filed its Second Amended Complaint [doc. # 81] on August 1, 2006, and the Secretary responded with Defendant's Memorandum Regarding the State's Second Amended Complaint [doc. # 83] on August 11, 2006. In accordance with the Court's prior rulings, the Secretary's Motion to Dismiss applies to the State's Second Amended Complaint, which for convenience will be referred to in this ruling as the "Complaint."

While the Secretary's Motion to Dismiss was pending, the Court also received from interested non-parties a number of requests to participate in the proceedings. *See* Motion to Intervene [doc. # 33] on behalf of the Connecticut State Conference of the NAACP and Individual Minority Parents and Students ("NAACP Motion"); Letter Motion for Leave to Answer Amended Complaint by Connecticut State Conference of the NAACP and Individual Minority Parents and Students in CT [doc. # 54]; Motion of the National Educational Association and Connecticut Educational Association for Leave to File Amicus Brief in Support of the State of Connecticut [doc. # 58]; Motion to Intervene by Bally and Olf Veldhuis [doc. # 62]; Amended Motion to Intervene by Bally and Olf Veldhuis [doc. # 63]; Motion for Joinder and to Counterclaim State of Connecticut by Bally and Olf Veldhuis [doc. # 71]. While reserving a final decision on the propriety of intervention, the Court granted permission for the NAACP to file a response to the State's Amended Complaint, *see* Intervenors' Memorandum in Response to Amended Complaint [doc. # 56], and also granted permission for and received an Amicus Brief from the National Educational Association and Connecticut Educational Association in Support from the State of Connecticut [doc. # 61]. In August, the Court denied the motions to intervene without prejudice to their renewal once the Court

5

had ruled on the challenges to its own subject matter jurisdiction. *See* Ruling and Order [doc. # 85]. As the Court explained at the time, it first needed to determine what claims, if any, would remain pending before deciding whether intervention by any of the interested parties was proper on any remaining claims. *See* Ruling and Order [doc. # 84]. Nonetheless, the Court is grateful for the input of these non-parties and it has considered their filings in the nature of amicus briefs in ruling on the present motion.

## II.

Inexplicably, given the explicit "without prejudice" nature of its ruling, the NAACP appealed the Court's ruling on the motions to intervene. *See* Notice of Appeal [doc.# 86]. The pendency of that appeal necessarily requires the Court to consider before proceeding any further whether it still has jurisdiction over the case, including the Secretary's pending motion to dismiss, since as a general rule when an appeal is filed, the district court is divested of "control over those aspects of the case involved in the appeal." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985). For two reasons, the Court is satisfied that it has jurisdiction to continue to consider the Secretary's Motion to Dismiss [doc. # 81].

First, it is not at all apparent to the Court that its denial of the motions to intervene without prejudice and without resolving the merits of those motions constitutes a final order of the Court that may be appealed. It is well settled that where "a notice of appeal has been filed from an order that is non-appealable, jurisdiction does not rest with the Court of Appeals, but remains with the district court." *Hoffenburg v. United States*, No. 00 Civ. 1686 (RWS), 2004 WL 2338144, at *2 (S.D.N.Y. Oct. 18, 2004) (collecting cases). The reasoning behind this rule is, as the Second Circuit has explained, that "no efficiency [is] gained by allowing a party arbitrarily to halt the district court

proceedings by filing a plainly unauthorized notice which confers on this Court the power to do nothing but dismiss the appeal." *Leonhard v. United States*, 633 F.2d 599, 610 (2d Cir. 1980).  Here, the Court has not decided the merits of the motions to intervene.  While the Second Circuit has stated that "dismissals with and without prejudice are equally appealable as final orders," *Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002) (internal quotation omitted), that case, and others like it, involved dismissals of an underlying claim, rather than the temporary disposition of a motion to intervene, *see id.* at 93 (citing *Elfenbein v. Gulf & W. Indus., Inc.*, 590 F.2d 445, 449 (2d Cir. 1978); *Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.*, 393 F.2d 441, 444 (2d Cir. 1968); *Rinieri v. News Syndicate Co.*, 385 F.2d 818, 821 (2d Cir. 1967)).  More to the point is a decision by the Seventh Circuit, in which the court held that the "district court plainly expressed its intent not to reach the merits of the motion to intervene" and that because the "decision by the district court did not resolve definitively whether [the putative intervenor] ought to be allowed to intervene . . . [it] is therefore not a final decision withing the meaning of 28 U.S.C. § 1291." *United States v. City of Milwaukee*, 144 F.3d 524, 528-29 (7th Cir. 1998).

Second, and in any event, even if the denial of the motion to intervene were a properly appealable order, the Second Circuit has held that the "filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989) *cited in Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 53 (2d Cir. 2004).  On the present motion, the Court is required to consider only whether it has subject matter jurisdiction, an issue that is unaffected by the requests to intervene.  *See* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1917 (2d ed. 1986) ("Intervention cannot cure any jurisdictional defect that

would have barred the federal court from hearing the original action."); *Fuller v. Volk*, 351 F.2d 323, 328 (3d Cir. 1965) ("It is well-settled that . . . intervention contemplates an existing suit in a court of competent jurisdiction.").  Because the motions to intervene are not relevant to the determination of subject matter jurisdiction, the Court concludes that it retains jurisdiction over the Secretary's Motion to Dismiss [doc. # 18].

Accordingly, the Court now turns to the Secretary's motion.  The Secretary has moved to dismiss this action under Rules 12(b)(1) and 12(b)(6) of the *Federal Rules of Civil Procedure*.  *See* Mot. to Dismiss [doc. # 18].  On a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), the Court "must accept as true all material factual allegations in the complaint,"  *J.S. ex rel. N.S. v. Attica Cent. Schools*, 386 F.3d 107, 110 (2d Cir. 2004).  Furthermore, a "complaint should not be dismissed . . . 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Todd v. Exxon Corp.*, 275 F.3d 191, 197-98 (2d Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996) (internal quotation omitted).

### III.

The following factual summary is taken from the Complaint [doc. # 81], the statutes involved, and certain documents expressly referred to in the Complaint, such as written correspondence between the Secretary and the State available on the website of the Connecticut Department of Education and incorporated by reference in the Complaint.[1]  *See, e.g.*, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached

---

[1] The website is located at http://www.state.ct.us/sde/nclb/Correspondence/index.html.

to it as an exhibit . . . materials incorporated in it by reference . . . and documents that, although not incorporated by reference, are 'integral' to the complaint.") (citations omitted).  Because the State's allegations can only be understood against the backdrop of the federal educational provisions implicated by the State's claims, the Court will begin with a brief summary of the relevant statutory provisions.

## A.       The No Child Left Behind Act

On January 8, 2002, President George W. Bush signed into law the No Child Left Behind Act of 2001.    The Act–a comprehensive, and in some quarters controversial, educational reform–amended the Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. §§ 6301-7941(2003)),  which provides for federal educational grants to states known as "Title I" funds.   The primary purpose of the Act, to which both parties affirm their allegiance, is to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education." 20 U.S.C. § 6301.  Academic accountability lies at the core of the Act, which seeks to improve educational attainment by ensuring that "high quality academic assessments, accountability systems, teacher preparation and training, curriculum, and instructional materials are aligned with challenging State academic standards." 20 U.S.C. § 6301(1); *see also* H.R. Rep. No. 107-63(I), at 281 (2001) (stating that the Act "holds States, local educational agencies (LEAs) and schools accountable for ensuring that all students, including disadvantaged students, meet high academic standards").

Congress enacted the Act pursuant to its power under Article I, Section 8, Clause 1 of the United States Constitution, the so-called "Spending Clause," which permits Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence

9

and general Welfare of the United States." Art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206-08 (1987) (internal quotations and citations omitted). In return for federal educational funds under the Act, Congress imposed on states a comprehensive regime of educational assessments and accountability measures. Congress also required that states use the federal funds made available under the Act "only to supplement the funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs assisted under this part, and not to supplant such funds." 20 U.S.C. § 6321(b)(1).

To be eligible for federal funds under the Act, a state must submit to the Secretary a plan developed by the state educational agency. 20 U.S.C. § 6311(a). Each state plan consists of three principle elements:

* First, the plan must demonstrate that the state "has adopted challenging academic content standards and challenging student academic achievement standards that will be used by the State, its local educational agencies, and its schools to carry out" the Act's requirements. 20 U.S.C. § 6311(b)(1)(A).

* Second, each state plan must show that "the State has developed and is implementing a single, statewide State accountability system that will be effective in ensuring that all local educational agencies, public elementary schools and public secondary schools made adequate yearly progress" in achieving objectives for educational improvement. 20 U.S.C. § 6311(b)(2)(A).

* Third, each state must show that the state "has implemented a set of high-quality, yearly student academic assessments that include, at a minimum, academic assessments in mathematics, reading or language arts, and science . . . ." 20 U.S.C. § 6311(b)(3)(A).

10

State plans are subject to a peer-review process and require approval by the Secretary. 20 U.S.C. § 6311(e). If a state's plan does not comply with the requirements of the Act, the Secretary is empowered to decline to approve it, *id.*, and is further authorized to impose penalties on non-compliant states, *id.* § 6311(g). The Secretary is also authorized to grant waivers from a majority of the Act's requirements. *Id.* § 7861.

Because provisions of the Act that explain state testing requirements and describe the Secretary's authority to waive provisions and to impose sanctions for non-compliance are central to the dispute between the State and the Secretary, the Court will describe those provisions in detail below. After presenting the relevant provisions of the Act, the Court will turn to the State's description of its own assessment regime, its requests for modification of certain statutory requirements of the Act, and the Secretary's response to those requests.

    *1.*    *Statutory Testing Requirements*

Of particular relevance to the present case, the Act requires states to conduct annual testing of students between grades three and eight, as well as high school students, in the subjects of mathematics and reading or language arts. 20 U.S.C. § 6311(b)(3). States are required to include "all students" in the annual testing regime, 20 U.S.C. § 6311(b)(3)(c)(ix)(I),[2] including two classes of students that are the focus of the State's claims in this case: (1) those whose grasp of English is limited–known as English Language Learner ("ELL") students; and (2) those who are eligible for special education services, 20 U.S.C. § 6311(b)(3)(C)(ix)(II)-(III).

With respect to students having limited proficiency in English, the Act provides that such

---

[2] Section 6311(b)(3)(C)(ix)(I) provides that states shall "provide for . . . the participation in [annual mathematics and reading or language arts] assessments of all students."

students "shall be assessed in a valid and reliable manner and provided reasonable accommodations on assessments . . . including, to the extent practicable, assessments in the language and form most likely to yield accurate data on what such students know . . . ." 20 U.S.C. § 6311(b)(3)(C)(ix)(III). Rather than immediately administering English-language tests to non-native speakers, states are encouraged to test students in their own languages, and may do so for up to three years.  However, once a student has attended school in the United States  for three years, the statutory default becomes assessment in English.  Native-language testing, though, may be extended for an additional two years on a case-by-case basis. 20 U.S.C. § 6311(b)(3)(C)(x).[3]  Like students with limited English proficiency, special education students must be included in the annual testing regime, and states are required to provide "the reasonable adaptations and accommodations for students with disabilities . . . necessary to measure the academic achievement of such students relative to State academic content and State student academic achievement standards . . . ." 20 U.S.C. § 6311(b)(3)(C)(ix)(II).

In addition to specifying which students must be tested, in which subjects, and with what frequency, the Act contains provisions directed at the quality of state assessments.  States may choose the assessments by which they measure proficiency, but those assessments must be aligned with the state's academic standards and must be "consistent with relevant, nationally recognized professional and technical standards," 20 U.S.C. § 6311(b)(3)(C)(iii).  The assessments also must include "multiple up-to-date measures of student academic achievement, including measures that

---

[3] Section 6311(b)(3)(C)(x) requires that states provide for "the academic assessment (using tests written in English) of reading or language arts of any student who has attended school in the United States . . . for three or more consecutive school years," except that a  local education authority may decide on a case-by-case basis "to assess such student in the appropriate language other than English for a period that does not exceed two additional consecutive years . . . ."

assess higher-order thinking skills and understanding," 20 U.S.C. § 6311(b)(3)(C)(vi).

The Act provides funds to assist states in developing and administering the assessments required by the Act. 20 U.S.C. §§ 7301-7301b. However, the Act provides states with a limited right to defer implementation of their testing programs (though states must still develop the relevant testing materials) if federal funding does not meet certain specified levels:

> A State may defer the commencement, or suspend the administration, but not cease the development, of the assessments described in this paragraph, that were not required prior to January 8, 2002, for 1 year for each year for which the amount appropriated for grants under section 7301b(a)(2) is less than--
>
> (i)   $370,000,000 for fiscal year 2002;
> (ii)  $380,000,000 for fiscal year 2003;
> (iii) $390,000,000 for fiscal year 2004;
> (iv)  $400,000,000 for fiscal years 2005 through 2007.

20 U.S.C. § 6311(b)(3)(D). The Court takes judicial notice of the fact that congressional funding has met or exceeded the foregoing amounts for the years in question. *See* Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-116, 115 Stat. 2177, 2202-03 ($387 million for fiscal year 2002); Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11, 328 ($387 million for fiscal year 2003); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 257 ($391.6 million for fiscal year 2004); Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 3144 ($400 million for fiscal year 2005). The State does not claim otherwise.

The ultimate purpose of the assessment requirements of the Act is to increase accountability, improve educational attainment, and close achievement gaps between different racial, ethnic, and socio-economic student populations. *See* 20 U.S.C. § 6301. Accordingly, the Act requires schools and states to report the results of student assessments as measured against a benchmark statistic

known as Annual Yearly Progress. *See id.* § 6311(b)(2)(B), § 7325. In determining adequate yearly progress, the Act requires states to use a statistically reliable method of measuring student progress based on academic assessments developed by the state. *Id.* § 6311(b)(2)(C)(ii), (iv). A state's definition of adequate yearly progress must also include "separate measurable annual objectives for continuous and substantial improvement" for all students. *Id.* § 6311(b)(2)(C)(v). At the risk of over-simplification, a school or district will fail to satisfy the Annual Yearly Progress requirement if one of certain specified subgroups of students in any grade fails to satisfy the state's annual proficiency standards. *Id.* § 6311(b)(2)(I); *see* Compl. [doc. # 81] ¶ 60. Schools or districts that fail to make Annual Yearly Progress face progressively severe consequences and must take corrective measures. *See generally* 20 U.S.C. § 6316(b)(1)-(8).

2.    *The Secretary's Authority to Approve or Decline State Plans*

The Act gives the Secretary authority to approve or decline a state's plan and to impose penalties on non-compliant states. Under 20 U.S.C. § 6311(e), the Secretary must evaluate a state's plan for compliance with the testing requirements described above. The Secretary must approve the plan within 120 days of its submission or immediately notify the state of the reasons for her determination that its plan does not conform to the statutory requirements. *Id.* § 6311(e)(1)(B)-(C). Before the Secretary can formally decline approval of a state's plan, she must "offer[] the State an opportunity to revise its plan[,] . . . provid[e] technical assistance in order to assist the State to meet the requirements[,] . . . and provid[e] a hearing." *Id.* § 6311(e)(1)(E). While the Secretary may disapprove a state plan, the Secretary does not have "authority to require a State, as a condition of approval of the State plan, to include in, or delete from, such plan one or more specific elements of the State's academic content standards or to use specific academic assessment instruments or items."

14

*Id.* § 6311(e)(1)(F).

The Act also anticipates the possibility that a state may wish to modify its plan after initial approval.  In such cases, the Act provides that "[i]f significant changes are made to a State's plan, such as the adoption of . . . new academic assessments . . . such information shall be submitted to the Secretary." *Id.* § 6311(f).  The relevant subsection does not describe the procedures that apply to the Secretary's review of proposed state plan amendments.  The Secretary contends that the required procedures are less rigorous than those required for the evaluation of the initial plan, *see* Def.'s Mem. Regarding the State's Second Am. Compl. [doc. # 83] at 8-16, while the State suggests that the procedures ought to be the same for both, *see* Compl. [doc. # 81] ¶ 152.

3.    *The Secretary's Authority to Waive the Act's Requirements*

Although the requirements of the Act are stated in mandatory terms, the Secretary is expressly empowered to waive most of them.  Section 7861(a) of the Act states that, subject to certain enumerated exceptions, the Secretary "may waive any statutory or regulatory requirement of this chapter for a State educational agency . . . that receives funds under a program authorized by this chapter . . . [and] requests a waiver . . . ."  The Secretary, however, may not grant a waiver from any of ten enumerated statutory provisions, including the requirement that "Federal funds [be used] to supplement, not supplant, non-Federal funds."[4]  20 U.S.C. § 7861(c).

A state applying for a waiver must "provide notice and information to the public regarding the waiver request," *id*. § 7861(b)(3), and must submit a proposal that describes "how the waiving

---

[4]  The statute also prohibits waivers for regulatory requirements related to: "(1) the allocation or distribution of funds to States, local educational agencies, or other recipients of funds under this chapter; (2) maintenance of effort; (3) comparability of services; . . . (5) equitable participation of private school students and teachers; (6) parental participation and involvement; [and] (7) applicable civil rights requirements . . . ." 20 U.S.C. § 7861(c).

of [the targeted] requirements will–(i) increase the quality of instruction for students; and (ii) improve the academic achievement of students," *id.* § 7861(b)(1).  The Secretary may grant a waiver for up to four years; after expiration of the waiver, the Secretary may renew it "if the Secretary determines that–(A) the waiver has been effective in enabling the State or affected recipient to carry out the activities for which the waiver was requested and the waiver has contributed to improved student achievement; and (B) the extension is in the public interest." *Id.* § 7861(d)(2).  Any decision to grant a waiver (though not to deny one) must be published in the Federal Register and disseminated to interested parties including educators, parents, and advocacy groups. *Id.* § 7861(g). The Secretary must also submit an annual report to Congress "summarizing the uses of waivers . . . [and] describing whether the waivers–(i) increased the quality of instruction to students; or (ii) improved the academic achievement of students." *Id.* § 7861(e)(4).

> 4.    *The Secretary's Authority to Impose Penalties for Non-Compliance With the Requirements of the Act*

Sections 1234c-e of the General Education Provisions Act, Pub. L. No. 90-247, 81 Stat. 814 (codified as amended at 20 U.S.C. §§ 1221- 1240 (2003)) ("GEPA"), provide the Secretary with a variety of mechanisms for enforcing the terms of "any program for which the Secretary or the Department [of Education] has administrative responsibility as provided by law," 20 U.S.C. § 1221(c), which includes the No Child Left Behind Act.  GEPA authorizes the Secretary to compel compliance with statutory requirements of educational programs by withholding federal funds, issuing a cease and desist order, entering into a compliance agreement, or "tak[ing] any other action authorized by law with respect to the recipient."  20 U.S.C. § 1234c.

Before the Secretary may withhold payments to any state, however, she must give the state

notice of intention to withhold, the basis for the withholding, and must provide the state with an opportunity for a hearing before the Department of Education's Office of Administrative Law Judges (the "ALJ").  *Id.* § 1234d.  Although the Secretary may not proceed to *withhold* payments before a state has had an opportunity to be heard, GEPA does authorize her to *suspend* payments pending the outcome of such a hearing.  *Id.* § 1234d(b)-(d).  The decision of the ALJ may be appealed to the Secretary, who reviews the ALJ's findings to see if there is "substantial evidence" to support the ALJ's findings.  *Id.* § 1234d(e).  Unless the Secretary sets aside the ALJ decision, it becomes a final agency action after sixty days.  *Id.* § 1234d(f).  However, if the Secretary modifies or sets aside the ALJ's decision, that decision becomes a final agency action upon written notification of the Secretary's decision to the recipient of federal funds.  *Id.*  Appeals from the final agency decision on enforcement are statutorily channeled to the United States Courts of Appeals.[5]  If an appeal is taken, the Secretary is barred from acting on the basis of the enforcement decision until judicial review is completed.  *Id.* § 1234g(a) ("The Secretary may not take any action on the basis of a final agency action until judicial review is completed.").

While the comprehensive enforcement mechanism set forth in GEPA applies generally to any educational program administered by the Secretary, including the No Child Left Behind Act, the section of the Act that describes states' annual testing requirements contains its own, additional penalty provision.  That provision states that the Secretary may penalize states for failing to meet the testing requirements set forth in § 6311(b)(3) of the Act by "withhold[ing] funds for State administration . . . until the Secretary determines that the State has fulfilled those requirements."  20

---

[5] *See* 20 U.S.C. § 1234g ("A recipient that desires judicial review of a[] [final agency] action . . . shall, within 60 days of that action, file with the United States Court of Appeals for the circuit in which that recipient is located, a petition for review of such action.").

U.S.C. § 6311(g)(2).  Connecticut alleges that its share of federal funds for state administration, under the Act, amounts to approximately $3 million per year.  Compl. [doc. # 81] ¶ 65.

Nothing in the Act itself requires a state to accept federal funds under the No Child Left Behind program.  According to the Complaint, however, in 2004, the State of Utah asked the Secretary about the consequences of opting out of the Act and relinquishing the federal funds that it provides.  The State asserts that Utah was told that it would lose not only those funds specifically designated for programs under the No Child Left Behind Act, but also twice that amount in funding for other programs calculated by reference to the amount of funding that a state receives under Title I.  *See id.* ¶ 67.  Accordingly, the State alleges that if it were to fail to comply with the Act, the cost to the State could potentially be hundreds of millions of dollars, comprising 5% of overall education spending in the State and as much as 15% of spending in the most disadvantaged school districts. *See id.* ¶ 64.

> 5.    *The Unfunded Mandates Provision*

Although the Secretary is empowered to disapprove a state's plan for failing to comply with the Act's provisions on testing, the Act expressly provides that the Secretary "shall not have the authority to require a State, as a condition of approval of the State plan, to include in, or delete from, such plan one or more specific elements of the State's academic content standards or to use specific academic assessment instruments or items."  20 U.S.C. § 6311(b)(3)(e)(1)(F).  Central to the State's Complaint in this litigation is a linguistically similar general provision of the Act, which the State contends further constrains the Secretary's authority to shape a State's plan. That provision is commonly known as the Unfunded Mandates Provision, and it reads as follows:

> § 7907 Prohibitions on Federal Government and use of Federal funds

> (a) General prohibition
> Nothing in this chapter shall be construed to authorize an officer or employee of the federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this chapter.

20 U.S.C. § 7907(a). The language of this provision was apparently carried over from the Act's predecessor legislation. *See* Pub. L. No. 103-382, 108 Stat. 3518, 3906 (1994); Pub. L. No. 103-227, 108 Stat. 125, 186 (1994). This provision has already been the subject of one judicial opinion, *School Dist. of Pontiac v. Spellings*, No. Civ. A. 05-CV-71535-D, 2005 WL 3149545 (E.D. Mich. Nov. 23, 2005), currently on appeal to the Sixth Circuit.

According to the State, the Unfunded Mandates Provision "requires full federal government funding for the provisions of the . . . Act." Compl. [doc. # 81] ¶ 5. Building on this interpretation, the State further reasons that, when federal funds are insufficient to cover a state's implementation of a statutory requirement, the Secretary is required by the Unfunded Mandates Provision to release the state from any obligation to comply with the insufficiently-funded obligation. Compl. [doc. # 81] ¶¶ 46-47. Furthermore, the State claims, to the extent that the Secretary has a different interpretation of the Unfunded Mandates Provision, she is impermissibly altering the conditions under which the State agreed to accept federal funds, in violation of the Spending Clause. *See* Compl. [doc. # 81] ¶ 191.

The Secretary responds that the Unfunded Mandates Provision is not implicated here because it was *Congress*, not a federal official, which established the Act's testing regime, and the Unfunded Mandates Provision applies only to mandates imposed by federal officials, not by the Act itself. *See* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 32; *see also School Dist. of Pontiac*, 2005

19

WL 3149545 (concurring with the Secretary's interpretation of the Unfunded Mandates Provision). In addition, the Secretary contends that the State's interpretation of the Unfunded Mandates Provisions cannot logically be reconciled with other sections of the Act that detail explicitly when a state may be excused from the Act's testing obligations due to insufficient federal funding. *See* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 34-37. It is undisputed that overall federal funding has not in any year fallen below the express levels that the Act provides will relieve states of their testing obligations. *See* 20 U.S.C. § 6311(b)(3)(D). The Secretary argues that to interpret the Unfunded Mandates Provision as broadly as the State requests would render these other sections of the Act superfluous, in contravention of a "cardinal principle of statutory construction." Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 32 (quoting *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation omitted)).

## B.    Connecticut's Approach to Academic Assessment

Insofar as the allegations regarding Connecticut's implementation of the Act are concerned, at this stage of the litigation, the factual allegations of the Complaint must be accepted as true. They are related below in accordance with that rubric.

For almost two decades before enactment of the Act, Connecticut had been administering its own system of statewide assessments. In 1986, the State began to assess the progress of its elementary and middle school students through the Connecticut Mastery Test ("CMT"), and in 1994, this system was extended to high school students with the Connecticut Academic Performance Test ("CAPT"). Compl. [doc. # 81] ¶ 88. For over a decade, the State has also emphasized accountability, profiling and publishing assessment results for its school districts and schools on an annual basis, including breakdowns by demographic groups. *Id.* ¶ 95. According to the State, its

efforts at accountability and assessment have paid substantial dividends: Connecticut's students are ranked among the highest achieving in the Nation and Connecticut has had success in narrowing the achievement gap for minority and economically-disadvantaged students. *See id.* ¶ 2. *But see* NAACP Motion at 2, Ex. A (citing a recent report where Connecticut "ranked dead last among states for its poor to non-poor achievement gap on the National Assessment of Educational Progress").

Connecticut's settled methodology for monitoring its students' progress differs in three key respects from the requirements of the Act. First, under Connecticut's educational assessment regime, the CMT and CAPT are administered in grades 4, 6, 8 and 10, and involve between 6 and 8.5 hours of testing on reading, writing, and mathematics. Importantly, the State's tests utilize not only multiple-choice questions, but also questions that require short essays and written explanations. *See* Compl. ¶ 88. Thus, for many years, the State has designed its testing regime and school curriculum around assessments that involve a substantial written component. In addition, at least some Connecticut schools have conducted "formative testing" in grades 3, 5, and 7. *See id.* ¶ 108, 111. Rather than a comprehensive, but lengthy, annual test, formative testing is conducted multiple times during the year and is designed to "give teachers, students and parents immediate, frequent feedback." *Id.* ¶ 109.

Second, the State has a long-standing practice of making reasonable accommodations for its special education students, including offering them the option of being tested at their instructional level rather than at their grade level as required by the Act. *Id.* ¶¶ 51, 92. "For example, a 10th grader who was being instructed at an 8th grade level for mathematics, pursuant to the student's individualized education plan, would be able to take the 8th grade CMT mathematics test." *Id.* ¶ 92.

Third, with respect to limited English proficiency students, the State's practice for two decades has been to permit these students three years of study in the United States before requiring them to take the State's assessments.  By contrast, the Act requires these students to be tested within one year of entry into the United States, albeit allowing them to be tested in their native language for the first three years.  *Id.* ¶¶ 54, 93, 115.

Although Connecticut has been and remains in compliance with the Act as interpreted by the Secretary, it has repeatedly requested and been denied modification of the statutory testing requirements relating to annual testing, testing of ELL students, and special education students.   In particular, the State has requested permission: (1) not to administer the CMT and CAPT annually, but rather to continue administering the Connecticut tests in grades 4, 6, 8, and 10 and formative testing in grades 3, 5, and 7; (2) to exclude limited English proficiency students from the annual testing requirements for three years and then test them in English; and (3) to provide up to 2% of special education students with the option of being assessed at instructional level rather than at grade level.  *Id.* ¶¶ 10, 105.  In addition to submitting these requests for waivers of the statutory testing requirements, the State submitted two proposals, which the Secretary construed and responded to as plan amendments.  These two requests pertained only to ELL students and special education students; the State has never submitted a proposed plan amendment to use only formative testing in grades 3, 5, and 7.  *Id.* ¶¶ 148, 151, 154.

The State's Complaint cites a number of grounds for its requests for modification of the Act's testing requirements.  The State's primary objection to each of the testing requirements is fiscal, *see id.* ¶ 14, though the State also hastens to add concerns about the efficacy of any testing regime it is

required to adopt.[6]  Fundamentally, Connecticut complains that strict adherence to the requirements

of the Act regarding annual testing, testing of ELL students, and testing of special education students

will cost more than the federal government provides to the State for those purposes.  Therefore,

requiring compliance with the Act would breach the Unfunded Mandates Provision, which in the

State's view requires the federal government to fully fund every requirement imposed by the Act.

*Id.* ¶ 8.[7]

Through briefing and amendment of its Complaint, Connecticut's claims regarding the testing

requirements of the Act have become clearer.  With respect to the requirement of annual testing, the

State's argument runs as follows: In the absence of permission to employ formative testing in grades

3, 5, and 7, the State will have to administer its CMT in each of grades 3 through 8, a task which

both state and federal studies reveal will cost almost double the available federal funding.  *Id.* ¶ 142;

*see also* Def.'s Mem. Regarding Pls.' Am. Compl. [doc. # 50] Exs. A, B (state and federal studies,

respectively).  The parties agree that the Secretary has indicated–albeit only informally–that the State

could comply with the Act if it continues its current practice of administering the CMT in grades 4,

6, 8, and 10 and introduces multiple-choice-only tests in grades 3, 5, and 7.[8]  *Id.*  ¶ 137.  This

---

[6] *See, e.g.*, Compl. [doc. # 81] ¶ 110 ("Formative testing is solidly grounded in scientifically based research, whereas there is no conclusive research that the summative testing required by the Secretary has any positive effect on student academic achievement.").

[7] When the Connecticut General Assembly amended the State's testing statutes in July 2003 to conform to the Act's testing requirements, it "expressly required that the costs attributable to the additional federal requirements of the . . . Act shall 'be paid exclusively from federal funds.'" Compl. [doc. # 81] ¶ 15 (quoting Conn. Gen. Stat. § 10-14n(g)).  The General Assembly removed this restriction in 2006 after, the State claims, federal funds had been exhausted.  *Id*. ¶ 16.

[8] While the Act, since 2005, requires annual testing in grades three through eight, the Act does not require testing in ninth grade, and only requires one annual test to be administered between grades ten and twelve.  *See* 20 U.S.C. § 6311(b)(3)(C)(v), (vii).

approach would cost less than administering CMT tests annually because multiple-choice tests are less time-consuming, and therefore less expensive, to grade than the CMT with its written response component.  Indeed, one study referred to and relied on in the State's Complaint indicates that federal funding would be more than sufficient to cover the State's testing obligations under the Act if the State abandoned its CMT tests and adopted multiple-choice-only testing in each grade.  *See* Def.'s Mem. Regarding Pls.' Am. Compl. [doc. # 50] Ex. B at 19 (United States General Accounting Office, GAO-03-389, *Title I: Characteristics of Tests Will Influence Expenses; Information Sharing May Help States Realize Efficiencies* (May 2003));  *see also* Compl. [doc. # 81] ¶¶ 77, 78 (citing the GAO report).  The State does not address the possibility of switching to a multiple-choice-only regime, but rather intimates (rather artfully in the Court's view) that federal funding might still be insufficient to cover the State's costs, even if the State elected to use multiple-choice-only testing.  *See* Compl. [doc. # 81] ¶¶ 8, 142, 173.

In any event, the State expressly alleges that alternating the CMT with multiple-choice testing, as the Secretary has suggested, is not a solution to its fiscal concerns for three reasons: First, the State has no formal assurance that such a plan would make it through the statutorily-mandated peer-review process or be approved by the Secretary.  *Id*. ¶ 139.  Second, and connected with the State's concern about peer review, the State asserts that administering tests without any written component would be inconsistent with best practices in education, and would potentially be in violation of the statutory requirement that assessments be "consistent with relevant, nationally recognized professional and technical standards," 20 U.S.C. § 6311(b)(3)(C)(iii), as well as the Act's declared purpose of improving student achievement.  *See* Compl. [doc. # 81] ¶¶ 110, 139, 161. According to the State, its preferred alternative–namely, CMT testing in grades 4,6 8, and 10 and

formative testing in grades 3, 5, and 7—"is solidly grounded in scientifically based research, whereas there is no conclusive research that the [multiple-choice] testing required by the Secretary has any positive effect on student academic achievement." *Id*. ¶ 110.   Third, the State contends that administering CMT tests in grades 4, 6, 8, and 10, and multiple-choice tests in grades 3, 5, and 7, would in any event require the State to spend at least $4 million above and beyond the funds supplied by the federal government, in violation of the Unfunded Mandates Provision.   By contrast, the State argues, its proposal to alternate the CMT with formative testing would be fully covered by the available federal funds. *Id*. ¶¶ 112, 142, 173.

With regard to its request for a three-year exemption for limited English proficiency students, the State asserts that the sheer number (150) of different native languages spoken by students in its schools makes introduction of native-language tests for the first three years (as the Act allows) prohibitively expensive. *Id*. ¶ 114.   Although the statute would allow the State to test its ELL students immediately using its standard English-language tests (and thus at no extra cost to the State), the State rejects this option on the following grounds: (1) that students learning English require at least three years to become proficient; (2) that the written-response format of its tests requires proficiency; and (3) that "[t]esting ELL students at a time and in a format when they cannot reasonably be expected to understand the questions undermines the goals and purposes of the Act[,] . . . violates the requirement that 'reasonable accommodations' be made for the assessments of . . . ELL students," and "is unsupported by significant scientifc research." *Id*. ¶¶ 53, 131, 162. Furthermore, the State believes that the choice between immediate tests in English and development of myriad foreign-language tests unfairly confronts it with the "[h]arsh dilemma of either spending millions of dollars of State funds to create, administer, and grade native language tests . . . or suffer

the series of escalating consequences when its . . . schools fail to make their [Annual Yearly Progress] because their ELL students cannot understand the English language tests." *Id*. ¶ 165.

In support of its request to be allowed to offer 2% of its special education students the option of being tested at instructional level rather than grade level, the State concedes that the choice is "cost-neutral."[9] *Id*. ¶ 117. However, the State maintains that (1) "[a]ssessing a special education student at instructional level rather than grade level is a reasonable accommodation," *id*. ¶ 118; (2) that the adjustment is required in order to avoid testing special education students "on topics that they have not been taught and that their [Individualized Education Plans] direct that they not be taught at that time," *id*. ¶ 131; and (3) that failing to offer this reasonable accommodation would violate "the purposes and goals of the Act," *id*. The Secretary has recently announced that states may test up to an additional 2% of their special education students using alternative assessments, in addition to the 1% exception already provided for the most cognitively challenged special education students. *Id*. ¶¶ 128, 129. The State observes, however, that the substitution of instructional-level tests for grade-level tests does not qualify as administering alternative assessments for purposes of the Secretary's new policy. *Id*. ¶ 150. Rather, the Secretary's new policy anticipates the development of "an entirely new testing regime for special education students for each grade to be tested." *Id*. ¶ 150. According to the State, even taking advantage of the partial exception from the default statutory testing requirement embodied in the Secretary's new policy would require the expenditure of $1.5 million dollars per year in State funds for the development and administration of the alternate assessment regime for special education students. *Id*. ¶¶ 130, 150. Nevertheless, during the summer

_____

[9] Because the State only requests a waiver for 2% of its special education students, *see* Compl. ¶ 105(c), the Court presumes that the remaining special education students are being tested at grade level in compliance with the Act.

of 2005, Connecticut requested and received permission to test 2% of its special education students under the new policy of alternative assessment. *Id.* ¶ 149. The Complaint does not indicate whether the State has implemented the alternative assessment method for the 2% of the State's special education students.

**D.     The Secretary's Response to Connecticut's Requests**

The State submitted applications for waivers and/or plan amendments regarding the previously discussed testing requirements in January, March, and May of 2005.[10] *Id.* ¶¶ 105, 114, 117. The Secretary first denied the requests made in the State's written application in February 2005.[11] *Id.* ¶¶ 120, 121. The Secretary denied the State's waiver requests for a second time in May 2005, after meeting with Connecticut's Commissioner of Education to discuss the reasons for Connecticut's requests as well as the State's plans for a lawsuit challenging the Secretary's implementation of the Act. *Id.* ¶¶ 134, 145. The day after the meeting between the parties, the Deputy Secretary of Education orally suggested that Connecticut administer multiple-choice tests in grades 3, 5, and 7, in order to save the expense of extending the CMT to those grades. *Id.* ¶ 137. The State responded to this suggestion in writing and explained its objections to introducing

---

[10] Nearly all of the correspondence referred to between the Secretary and the State may be found on the State's website at http://www.state.ct.us/sde/nclb/Correspondence/index.html.

[11] The Secretary sought additional information about, but did not deny, one of the State's waiver requests to conduct "cohort analysis," whereby the State would compare the performance of a specific group of students over an extended period of time, as opposed to comparing students at a given grade level to a new group of students at that grade level the following year. *See* Compl. [doc. # 81] ¶ 105(b); Mem. in Supp. of Def.'s Mot. to Dismiss [doc. #18] at 14 n.4. The Secretary later reported that she intended to consider such requests as part of a pilot program "to explore the feasibility of growth models as accountability mechanisms." *See* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. #18] at 14 n.4 (citing Press Release, U.S. Department of Education, Secretary Spellings Announces Growth Model Pilot (Nov. 18, 2005), http://www.ed.gov/print/news/pressreleases/2005/11/11182005.html).

multiple-choice testing (as discussed above).  The Secretary again denied the State's requests, this time suggesting that the State consider diverting federal funds that it currently allocated to non-testing programs to cover any additional costs of testing.  *Id*. ¶ 145.

The Secretary's third and final denial of the State's requests for modification of the testing requirements came in June 2005.  *Id*. ¶ 149.  Although on this occasion the Secretary construed Connecticut's requests regarding ELL and special education students as requests for plan amendments rather than as waiver requests, *id*. ¶ 151, the Secretary did not offer the State an opportunity to revise the amendments or a hearing at which to discuss the amendments prior to issuing her denial of the requests, *id*. ¶ 152, to which the State argues it was entitled under 20 U.S.C. § 6311(e)(1)(E).

According to the State, the Secretary's principle reason for denying the State's requests is that the requirement of annual testing is fundamental to the successful implementation of the Act and will not be waived.  *Id*. ¶¶ 123, 124, 159.  The Secretary offered a more specific rationale in her February 28, 2005 letter to the State.  In that letter, the Secretary explained that national data indicated a substantial achievement gap between black, Hispanic, and white students in Connecticut, which necessitates annual testing in each grade "to determine if these gaps are being closed, and, if they are not, adjustments must be made."  Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 11 (citing Letter from Secretary Spellings to Commissioner Sternberg (Feb. 28, 2005) at 1).  The Secretary also denied the State's waiver requests related to ELL and special education students after noting substantial achievement gaps between those categories of students and others in Connecticut.  *See id*. at 12-13.  Though she denied the waiver requests, the Secretary alluded to future review of her stated policies with respect to ELL and special education requirements.  *See id*.

Both parties agree that the State has been in compliance with all of the requirements of the Act as interpreted by the Secretary throughout the dispute. Compl. ¶ 4. Due to the State's compliance, there has been no need for the Secretary to bring an enforcement action against the State for violating any provision of the Act.

## IV.

### A. Count I – Unfunded Mandates Provision

In Count I of the Complaint [doc. # 81], the State seeks a declaratory judgment to clarify the meaning of the Unfunded Mandates Provision. The State alleges that the Secretary has violated the Unfunded Mandates Provision by requiring the State to expend funds in order to comply with the Secretary's interpretation of the Act. Count I challenges the Secretary's interpretation of three specific sections of the Act: (1) the requirement that special education assessments be conducted at grade level rather than instructional level, Compl. [doc. # 81] ¶¶ 117, 129, 131; (2) the requirement that ELL students receive mathematics assessments in their first year in the country and reading assessments in the following year, *id*. ¶¶ 105, 115, 131; and (3) the requirement that non-formative annual testing occur in every grade, *id*. ¶ 112. The State seeks a declaratory judgment that, in accordance with the Unfunded Mandate Provision, the State cannot be required to spend its own funds to comply with the Act, as interpreted by the Secretary. *See id*. ¶ 186.

The Secretary raises a number of threshold objections to the Court's consideration of the merits of the State's claims in Count I. The Court will address each objection in turn.

*1. Standing*

The Court must first consider the threshold question of justiciability and in particular, whether the State has standing to assert its claims in Count I. *See Denney v. Deutsche Bank AG*, 443

29

F.3d 253, 263 (2d Cir. 2006) (citing *Warth*, 422 U.S. at 498).  As the Supreme Court has explained:

> This 'irreducible constitutional minimum' of standing requires: (1) that the plaintiff have suffered an 'injury in fact'–an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of–the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Defenders of Wildlife*, 504 U.S. at 560-61).  For purposes of determining standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth*, 422 U.S. at 501.  According to the Secretary, the State lacks standing for two reasons.  First, the State is currently in compliance with the Act and has suffered no injury in fact because no federal funds have been withheld from the State.  *See* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 27.  The State concedes that it is currently in compliance with the Act and that there is no immediate risk of funds being withdrawn.  *See* Compl. [doc. # 81] ¶ 9.  Second, in a related vein, the Secretary argues that all of the State's alleged injuries are self-inflicted and therefore do not qualify as an injury in fact because the State can comply with the annual testing requirements, as construed by the Secretary, without expending more than the federal funds received by the State under the Act.  *See* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. #18] at 23-24, 28 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (holding that plaintiff-states lacked standing to challenge income taxes imposed on their residents by other states, where the proximate cause of the plaintiff-states' injury was the decision of their own legislatures to grant tax credits for income taxes paid to other states)).  In effect, the Secretary says that the State wants to employ testing methods that exceed what is required

by the Act and then blame the federal Government for failing to pay for more than the Act itself requires.

The Secretary's arguments are not without force.  However, the Court need not determine whether the risk of having future funding withdrawn is imminent enough to constitute an injury in fact under standing principles because a more immediate injury exists.  The State alleges in its Complaint that the *current* federal funds it receives under the Act fail to cover the costs of administering the tests required by the Act.  Thus, in paragraph 8 of its Complaint, the State expressly alleges as follows: "Federal funding to Connecticut for [the Act's] mandates is substantially less than the costs attributable to the federal requirements of the . . . Act."  Compl. [doc. # 81] ¶ 8.  Whether the State will be able to establish the truth of this assertion–something the Secretary hotly disputes–is irrelevant, for at this preliminary stage of the proceedings, the Court must accept the allegations of the State's Complaint as true.  As the Second Circuit has recently explained,

> On a motion to dismiss for lack of standing, we presume the general factual allegations embrace those facts necessary to support the claim, and are constrained not only to accept the truth of the plaintiffs' jurisdictional allegations, but also to construe all reasonable inferences to be drawn from those allegations in plaintiffs' favor.

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 2006 WL 2588005, at * 5 (2d Cir. Sept. 8, 2006) (citing *Defenders of Wildlife*, 504 U.S. at 561; *Warth*, 422 U.S. at 501-02).

If the facts alleged by the State are true, as the Court must accept at this point, then the State is currently suffering an injury in fact, and there is a causal connection between the government conduct complained of and the injury alleged.  *See* Compl. [doc. # 81] ¶ 14 ("By denying Connecticut's waiver requests, the Secretary is requiring Connecticut to expend substantial sums in excess of federal funding to comply with the [Act's] mandates as interpreted by the Secretary and

the Act."); *Brooklyn Legal Servs.*, 2006 WL 2588005, at * 7 ("[W]hether a plaintiff has standing will 'depend[] considerably upon whether the plaintiff is himself an object of the [government action] at issue,' and '[i]f he is, there is ordinarily little question that the action . . . has caused him injury.'") (quoting *Defenders of Wildlife*, 504 U.S. at 561-62). Furthermore, if current funding is inadequate, a declaratory judgment prohibiting the Secretary from requiring the State to spend additional funds to comply with the Act would likely redress the State's claimed injury. Compl. [doc. # 81] ¶ 186. The State has therefore met the required elements of standing.[12]

### 2. Jurisdiction Over a Pre-Enforcement Challenge

The second threshold issue the Court must address is whether the Court has jurisdiction to entertain this pre-enforcement challenge to the Secretary's implementation of the Act. The word "pre-enforcement" is used because, at this point, the State continues to comply with the Act. Compl. [doc. # 81] ¶ 9. Moreover, the Secretary has not declared the State to be in violation of any provision of the Act, and she has not taken any steps, preliminary or otherwise, to enforce the Act or withhold federal funds that the State receives under the Act. Therefore, the State seeks a judicial determination regarding the Secretary's interpretation of the Act even though, to date, the Secretary has taken no concrete action in support of her interpretation, other than the denials of waivers and plan amendments which are the subjects of Counts III and IV, not Count I. In short, the State asks the Court to tell it and the Secretary who is right regarding their respective interpretations of the Act before either of them has taken any formal action based upon their respective interpretations.

---

[12] Having concluded that the State has standing, the Court does not reach the question of whether the Connecticut General Assembly, which has joined as a plaintiff in this action, also has standing. *Cf. U.S. Dept. of Labor v. Triplett*, 494 U.S. 715, 719 (1990) (finding it did not have to determine whether a second complainant had standing after finding that the first complainant did).

According to the Secretary, "[t]his pre-enforcement challenge represents an impermissible end-run around the mandatory administrative and judicial review scheme set forth in the governing statute." Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 14.  While conceding that this is a close question, the Court agrees with the Secretary.

Whether a court can entertain a pre-enforcement action, such as the one at issue here, is determined under the framework developed by the Supreme Court in *Thunder Basin v. Reich*, 510 U.S. 200 (1994).  In *Thunder Basin*, the Mine Safety and Health Administration adopted a regulation requiring the posting of certain information regarding miners' representatives.  Rather than post the information required by the regulation or challenge the regulation through the statutory review process provided by the Federal Mine Safety and Health Amendments Act of 1977 (the "Mine Act"), a mine operator filed a lawsuit in district court seeking to enjoin the agency from enforcing the regulation against the company.  The company argued that pre-enforcement review of the regulation was necessary because  the company would be irreparably harmed if it complied with the regulation and would face stiff civil penalties if it did not.  The Supreme Court noted that the Court of Appeals dismissed the case because, in part, to hold otherwise "would permit preemptive strikes that could seriously hamper effective enforcement of the [Mine] Act, disrupting the review scheme Congress intended."  *Id.* at 206 (quoting *Thunder Basin v. Reich,* 969 F.2d 970, 975 (10th Cir. 1992)).

The Supreme Court agreed with the Tenth Circuit's decision, holding that the district court lacked subject matter jurisdiction to entertain the mine operator's challenge.  The Supreme Court began by enunciating a test for determining whether to permit such pre-enforcement review: "In cases involving delayed judicial review of final agency actions, we shall find that Congress has allocated initial review to an administrative body where such intent is 'fairly discernible in the

statutory scheme.'"  *Id.* at 207.  And "[w]hether a statute is intended to preclude initial judicial review," the Supreme Court stated, "is determined from the statute's language, structure, and purpose, its legislative history . . . and whether the claims can be afforded meaningful review."  *Id.* (citation omitted).  Reviewing the Mine Act in detail, the Court held that "the Mine Act's comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a fairly discernible intent" to preclude judicial review outside the administrative and judicial review process provided in the Mine Act itself.  *Id.* at 215.  While acknowledging the presumption that Congress does not intend to prohibit all judicial review, the Court held that the presumption of judicial review was not applicable, because the Mine Act did provide for judicial review, just not before completion of the administrative process contemplated by the Mine Act.  *Id.* at 207 n.8.

The No Child Left Behind Act itself does not include an enforcement scheme analogous to that provided in the Mine Act.  However, as the Secretary points out, *see* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 16-18, GEPA provides procedures that govern the Secretary's enforcement of the requirements of the Act, and GEPA does contain a "comprehensive enforcement scheme" analogous to that of the Mine Act.  *Compare Thunder Basin*, 510 U.S. at 216 ("We conclude that the Mine Act's comprehensive enforcement structure . . . establishes a 'fairly discernible' intent to preclude district court review in the present case.") (citing 30 U.S.C. § 816(a)(1) ("Any person adversely affected or aggrieved by an order of the Commission . . . may obtain a review of such order in any United States court of appeals . . . .")) *with* 20 U.S.C. § 1234g(a)-(b) (describing that any recipient of federal funds under the Act who would be "adversely affected by a final agency action" and who "desires judicial review" of the agency's decision shall "file with the

34

United States Court of Appeals . . . a petition for review of such action.").  Both GEPA and the Mine Act require the agency to provide notice of an alleged violation of statutory or administrative requirements to the alleged offender.  *Compare* 30 U.S.C. § 814(a) (Mine Act) *with* 20 U.S.C. § 1234d(b) (GEPA).  Both also provide for a hearing before an Administrative Law Judge, subject to a discretionary review by a Commission, in the case of the Mine Act, or the Secretary, in the case of GEPA.[13]  *Compare* 30 U.S.C. § 823(d) (Mine Act) *with* 20 U.S.C. § 1234d(c), (f) (GEPA). Moreover, under both statutes, the agency's decision following that discretionary review is considered to be a "final agency action," and it may be appealed to the appropriate United States Court of Appeals.  *Compare* 30 U.S.C. § 816(a)(1) (Mine Act) *with* 20 U.S.C. § 1234g(a)-(b) (GEPA).  Thus, both statutes allow for "meaningful and adequate opportunity for judicial review" after final agency action.  *Bd. of Govs. of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).  The court of appeals must then uphold the agency's factual findings if supported by substantial evidence in the record.  *Compare* 30 U.S.C. § 816(a)(2) (Mine Act) *with* 20 U.S.C. § 1234g(c) (GEPA).  Finally and importantly, both GEPA and the Mine Act provide that the agency cannot implement any enforcement action until a court has completed its review.  *Compare* 30 U.S.C. §§ 816, 820(i) *with* 20 U.S.C. § 1234g(a) (GEPA).[14]

---

[13] The State claims that the "most significant[]" difference between the Mine Act and GEPA is that GEPA lacks the independent commission present in the Mine Act to review ALJ decisions prior to an appeal to the Court of Appeals.  *See* State's Opp'n to the Sec.'s Mot. to Dismiss [doc. # 25] at 17.  The Supreme Court made clear, however, that the existence of the Commission was not determinative, for the Court stated that, even if the Commission did not exist, "petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals."  *Thunder Basin*, 510 U.S. at 215.

[14]The Court recognizes that under the Act, the Secretary may withhold administrative funds under 20 U.S.C. § 6311(g)(2) with no express provision for judicial review.  However, the administrative funds constitute, at most, 1% of the Title I funds the State receives from the federal

Furthermore, while the Supreme Court in *Thunder Basin* did not rely heavily on the legislative history of the Mine Act in considering whether it precluded pre-enforcement challenges, *see Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin.*, 376 F.3d 239, 243 n.2 (4th Cir. 2004), the legislative history of GEPA, like that of the Mine Act, suggests a "concern with channeling and streamlining the enforcement process." *Thunder Basin*, 510 U.S. at 216.  For example, the House Report for GEPA stated that the enforcement scheme was designed to "consolidate[] most of the provisions relating to enforcement and judicial review in existing state-operated programs, and . . . establish[] a comprehensive system for enforcement by the [agency] of the requirements relating to education programs."  H.R. Rep. No. 95-1137, at 141 (1978).  Allowing the State to challenge the Secretary's interpretation of the Unfunded Mandates Provision prior to any agency action against the State would undermine the "comprehensive system for enforcement" provided by Congress.  *See, e.g.*, *Doe v. F.A.A.*, 432 F.3d 1259, 1263 (11th Cir. 2005) ("The [complainants] simply cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion."); *Great Plains Coop v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000) ("Great Plains's complaint is an impermissible attempt to make an 'end run' around the statutory scheme. . . .  It would create two avenues of judicial review and would allow the plaintiff to short-circuit the administrative review process and the development of a detailed factual record by

---

Government, *see* 20 U.S.C. § 6304(a), or approximately $3 million, *see* Compl. [doc. # 81] ¶ 65, assuming the Secretary were to initiate such an action.  Of course, no such withholding has occurred or been threatened to date.

the agency.").[15]

The Supreme Court in *Thunder Basin* also explained that there are pragmatic reasons to insist on compliance with the statutory enforcement mechanism beyond simply adhering to the dictates of Congress regarding the scope of district court jurisdiction.  The statutory review process is the means by which "agency expertise is brought to bear" on the issues raised.  *Thunder Basin*, 510 U.S. at 215. That rationale resonates in this case as well.  As the State has made clear, its statutory and constitutional concerns in this case are principally fiscal in nature.  As a consequence, determining whether the Secretary correctly interpreted  and applied the specific provisions of the Act to the State's proposals involves not only an analysis of the statute itself but also a factual and technical assessment of the State's testing programs and its claims regarding the expense of the various alternatives that have been proposed.  For example, deciding how much a given testing program costs to implement, how much money the State spent on testing prior to any additional requirements imposed by the Secretary under the Act, whether the State is using federal funds to supplant or supplement state funding, and to what extent federal funds successfully or unsuccessfully cover the cost of implementation are all questions that would benefit from a well-developed factual record and the agency's expertise in the area of educational funding.  *See E. Bridge, LLC v. Chao*, 320 F.3d 84,

---

[15]   The Supreme Court considered the jurisdiction of Article III courts in the context of a GEPA claim in *Bell v. New Jersey*, 461 U.S. 773 (1983).  In *Bell*, the plaintiffs brought their claim directly to the court of appeals rather than a district court.  Therefore, the issue before the Supreme Court was not whether a district court would have jurisdiction under the enforcement scheme, but rather whether the agency's action constituted a "final agency action" that was subject to judicial review under GEPA.  *Bell* noted, however, that each section of GEPA allowing for judicial review "includes a subsection dealing with finality and suggesting that only a 'decision' of the [agency] is subject to review."  *Id*. at 778.  *Bell*'s analysis of the comprehensive enforcement mechanism provided by GEPA lends further support to the Court's conclusion that the Act does not allow for pre-enforcement judicial review.

89 (1st Cir. 2003) ("Committing initial review to the agency is often sensible policy.  Because the administrative agency may possess greater expertise with respect to the organic statute, agency review can be more informed and thus more expeditious, and scarce judicial resources can be conserved for other areas of pressing concern.").

Insisting on compliance with the review process provided by GEPA will also require the Secretary to a take a formal position regarding the testing requirements and the Unfunded Mandates Provision.  Right now, all the Court has to consider is the Secretary's informal determination that Connecticut's current alternate-year testing scheme supplemented by multiple-choice tests in the other years would satisfy the Act, but there is good reason to insist that the Secretary take a formal position on such issues.  After all, it is one thing to file a brief on hypothetical questions; it is quite another for the Secretary to take the extraordinary step of withholding much needed federal funds from a state whose congressional delegation and citizens would surely not take too kindly to such an act.  Perhaps the Secretary will take no enforcement action; perhaps she will withhold only a modest amount of federal funds; perhaps the State will back off of its position.  In the Court's view, there is great benefit in allowing both the political, as well as the administrative, process to run its course in this way.  Otherwise, every time a state gets into a disagreement with the Secretary, the state will be encouraged to run to federal court to learn who is right even before that disagreement has evolved into any concrete action.

Candor requires the Court to acknowledge that certain facts weigh against its conclusion regarding pre-enforcement review, though on balance, they do not outweigh the evidence of Congress's intent to preclude pre-enforcement review.  For one, Congress certainly could have been more explicit in precluding pre-enforcement review.  *See MCorp*, 502 U.S. at 44 (citing the relevant

statute in the case, 12 U.S.C. § 1818(i)(1), which stated that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [agency] notice or order under this section, or to review, modify, suspend, terminate, or set aside any such notice or order"). Explicitly precluding judicial review, however, is not a condition for finding statutory preclusion of pre-enforcement challenges. After all, there was no such language in the Mine Act. All that is required is that congressional intent be "fairly discernible in the statutory scheme." *Thunder Basin*, 510 U.S. at 207 (internal quotation omitted). Other courts have concluded that a statute precluded pre-enforcement review even without an explicit instruction from Congress. *See, e.g.*, *Nat'l Taxpayers Union*, 376 F.3d at 242-43 (finding statutory preclusion without express language); *Great Plains Coop*, 205 F.3d at 355 (same); *In re Establishment Inspection of Manganas Painting Co.*, 104 F.3d 801, 803 (6th Cir. 1997) (same); *see also Bell*, 461 U.S. at 777-78 (alluding to the fact that no judicial review is available under GEPA until there has been final agency action even though there is no explicit preclusion provision).

The State also points out, and the Court agrees, that GEPA's enforcement scheme does not "channel" all review in a manner identical to the Mine Act. *See Thunder Basin*, 510 U.S. at 216; State's Opp'n to the Sec.'s Mot. to Dismiss [doc. # 25] at 15-17. For example, the Secretary asserts that the suspension of state administrative funds under the Act is not subject to judicial review under GEPA, *see* Mem. in Supp. of Def.'s Mot. to Dismiss [doc. # 18] at 18 n.9. And in her most recent filing, the Secretary conceded that her denial of a state's plan amendment could be reviewed by a district court under the APA so long as her decision constituted a final agency action under 5 U.S.C. § 702. *See* Def.'s Mem. Regarding the State's Second Am. Compl. [doc. # 83] at 2-3, 16-23; *Cf. Rocky Mountain Radar, Inc. v. F.C.C.*, 158 F.3d 1118, 1122 n.7 (10th Cir. 1998) (finding no

statutory preclusion after noting that the statute granted district courts jurisdiction over certain pre-final agency action claims in addition to the typical circuit court jurisdiction).  In *Thunder Basin*, by contrast, all judicial review was channeled to the courts of appeal.  On balance, however, the Court does not believe that these relatively minor differences from *Thunder Basin* undermine the Court's conclusion that the overall language, structure, and legislative history of GEPA fairly reflect an intent to preclude the type of pre-enforcement action brought by the State in this case.  *See, e.g.*, *Nat'l Taxpayers Union*, 376 F.3d at 242 (finding statutory preclusion even though district courts had jurisdiction over some claims while circuit courts had jurisdiction over others).

Finally, the State argues that it is a sovereign, not a company as in *Thunder Basin* and many other post-*Thunder Basin* cases, and that as a sovereign it should not be forced to violate the Secretary's commands merely to obtain a judicial ruling on the validity of the Secretary's arguments. This argument has considerable rhetorical appeal, but it fades upon analysis.  After all, GEPA is a statute that concerns states, not companies, and Congress knew that when it enacted GEPA.  Yet Congress did not provide any pre-enforcement review mechanism in GEPA to alleviate states of the affront of having to violate the Secretary's commands before obtaining judicial review.  To the contrary, GEPA provides a comprehensive enforcement scheme that contemplates judicial review only *after* the agency has determined that a state has violated the Act.  *See Bell*, 461 U.S. at 777-78.

Concluding, as the Court does, that GEPA precludes pre-enforcement challenges such as that launched by the State in Count I does not end the Court's inquiry.  For the Supreme Court in *Thunder Basin* held that, despite the statutory preclusion for claims covered under the statute, district courts would nevertheless maintain jurisdiction "over claims considered 'wholly collateral' to a statute's review provisions and outside the agency's expertise . . . particularly where a finding of preclusion

could foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212 (citations and internal quotation omitted).  More recently, the First Circuit clarified this exception to *Thunder Basin*, stating that "[t]o unsettle this presumption of initial administrative review—made apparent by the structure of the organic statute—requires a strong countervailing rationale." *E. Bridge, LLC*, 320 F.3d at 89 (citing *Thunder Basin*, 510 U.S. at 212-17).  The First Circuit listed the specific circumstances under which the Supreme Court has previously made exceptions to *Thunder Basin* preclusion.  These circumstances include: "situations where plaintiffs will effectively receive no review at all, where the administrative process is fundamentally flawed because of a pattern and practice of administrative agency abuse, where the agency's behavior is utterly lawless, and where further administrative exhaustion is deemed futile." *Id.* (footnotes omitted).

None of these exceptions apply here.  First, at a general level, the disagreement over the Secretary's interpretation and implementation of the Unfunded Mandates Provision is not "wholly collateral" to the administrative enforcement scheme.  As rehearsed above, reviewing the costs and efficacy of implementing programs under the Act falls squarely within the expertise of the Secretary and the enforcement mechanisms provided by Congress.  *See Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 874 (D.C. Cir. 2002) (finding a claim was not "wholly collateral" since it "require[s] interpretation of the parties' rights and duties under the Act and its regulations, and therefore fall[s] squarely within the Commission's expertise") (internal quotations omitted).  The Supreme Court's words in *Thunder Basin* apply equally here: "Petitioner's statutory claims at root require interpretation of the parties' rights and duties under [the Mine Act and regulation], and as such arise under the Mine Act and fall squarely within the [agency's] expertise." *Thunder Basin*, 510 U.S. at 214.

The State argues that two of the exceptions specified by the First Circuit in *Eastern Bridge*

apply here.  First, the State claims that the penalty the State faces for violating the Act–the potential

loss of all Title I funding, totaling hundreds of millions of dollars–is so onerous that it will be forced

to continue to comply with the Act and therefore will be deprived of all judicial review.  *See* State's

Supplemental Br. in Supp. of Def.'s Mot. to Dismiss on Matters Raised During the Apr. 28, 2006

Oral Argument [doc. # 64] at 2-10.  In this regard, the Court notes that the Second Circuit has held

that "any legislative scheme that denies subjects an opportunity to seek judicial review of

administrative orders except by refusing to comply, and so put themselves in immediate jeopardy

of possible penalties so heavy as to prohibit resort to that remedy, runs afoul of the due process

requirements of the Fifth and Fourteenth Amendments."  *Schulz v. Internal Revenue Serv.*, 413 F.3d

297, 303 (2d Cir. 2005) (internal quotation and citation omitted).[16]  Second, the State contends that

further administrative exhaustion would be futile because the Secretary has made her position on the

Act clear and will not change her mind.  *See generally* State's Supplemental Br. in Supp. of Def.'s

Mot. to Dismiss on Matters Raised During the Apr. 28, 2006 Oral Argument [doc. # 64].  The Court

disagrees with both arguments.

The State's argument that the potential penalties for violating the Act are so onerous that the

State will be forced to comply with the Secretary's interpretations has been severely, if not

---

[16]  The Secretary argues that due process protections may only be claimed by private entities and not states–that is, that a state is not a "person" within the meaning of the Due Process Clause of the Fifth Amendment.  *See* Def.'s Mem. Regarding Issues Raised at Apr. 28, 2006 Conf. [doc. # 65] at 13.  Since the State has a means of raising its claims and also complying with the statute, there is no due process concern here.  Therefore, the Court need not and does not address the Secretary's argument.  Even if the Court were to find a colorable due process claim and conclude that the State could raise such a claim, the Secretary has agreed not to suspend program funds, in this case only, without holding an administrative hearing under GEPA.  *See id.* at 16.  Thus, any suspension would be subject to judicial review before becoming effective.  *See* 20 U.S.C. § 1234g(a).

completely, undermined by the Secretary's concession that her final decisions on plan amendments may be reviewed by a district court under the APA. *See* Def.'s Mem. Regarding the State's Second Am. Compl. [doc. # 83] at 2-3, 16-23. The Secretary has stated that submission of a plan amendment does not void the existing plan, *see* Def.'s Mem. Regarding Issues Raised at Apr. 28, 2006 Conf. [doc. # 65] at 18, so the State may submit proposed plan amendments (for example, omitting non-formative testing every other year) without risking the loss of any Title I program funds. Because the refusal to approve a plan amendment may be reviewed by a district court without the risk of the State losing federal funding, the State is able to continue to comply with the Act while at the same time seeking judicial review of its claims regarding the Act, albeit in the context of an appeal of a denial of a proposed plan amendment.[17] As was true in *Thunder Basin*, "the dilemma of either obeying the law and thereby forgoing any possibility of judicial review, or risking 'enormous' and 'severe' penalties, effectively cut[ting] off all access to the courts. . . . does not exist here . . . ." *Thunder Basin*, 510 U.S. at 221 (Scalia, J., concurring) (citations omitted).

The State's futility arguments are equally unavailing. The State reasons that it would be futile for the Court to require final agency action, since the Secretary's "legal interpretation of the Unfunded Mandates Provision is well-known and directly contrary to the State's view. Pursuing a plan amendment on the alternate grade testing would simply unduly delay the inevitable district court adjudication of the State's claims." State's Supplemental Br. in Supp. of Def.'s Mot. to Dismiss on Matters Raised During the Apr. 28, 2006 Oral Argument [doc. # 64] at 13 (citations omitted). To

-----

[17] At this stage, the Court makes no determination of precisely what claims the parties may raise as part of a review of a denial of a plan amendment, as that will necessarily depend upon the administrative record, the nature of the amendment sought, the arguments advanced in support, and the basis for denial of the amendment. *See infra* Section IV.D.

support this proposition, the State relies on *Bd. of Ed. of City School Dist. of N.Y. v. Harris*, 622 F.2d 599 (2d Cir. 1979). In *Harris*, the court stated "that where resort to the agency would plainly be unavailing in light of its manifest opposition or because it has already evinced its 'special competence' in a manner hostile to petitioner, courts need not bow to the primary jurisdiction of the administrative body." *Id*. at 607. However, the court in *Harris* reached that conclusion only after finding that both parties perceived "the issue presented as a purely legal one . . . and submitted the matter upon a stipulated set of facts and upon their respective briefs." *Id*. Here, in contrast, the facts are hotly disputed and the Court has concluded that judicial review would be enhanced by forcing the parties to take concrete positions at the administrative level and by development of a full administrative record. Therefore, the Court believes that requiring formal and final agency action, even if the ultimate results can be surmised, is not at all futile.

In sum, the Court concludes that it lacks subject matter jurisdiction to entertain this pre-enforcement declaratory judgment action to determine whether the Secretary's construction of the Unfunded Mandates Provision is consistent with the Act, as the State has sought in Count I.

*3. Prudential Ripeness*

Even if the Court were wrong on whether the Act allows pre-enforcement judicial review, the Court would nonetheless lack jurisdiction to entertain the claims asserted in Count I because the Court agrees with the Secretary that those claims are not ripe for judicial determination. The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Suitum v. Tahoe Reg. Planning Agency*, 520 U.S. 725, 733 n.7 (1997). In its prudential form, ripeness is one of the means courts have developed to further what Professor Alexander Bickel termed the "passive virtues"–a willingness in appropriate

44

circumstances to decline or defer jurisdiction where prudence counsels avoidance. *See* Alexander M. Bickel, The Least Dangerous Branch 111-198 (1962); Alexander M. Bickel, *The Supreme Court 1960 Term Foreward: The Passive Virtues*, 75 Harv. L. Rev. 40, 58-64 (1961). As Judge Calabresi has explained, "[p]rudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).

The Second Circuit has explained that at the heart of the prudential ripeness doctrine is the question of "whether [the court] would benefit from deferring initial review until the claims [the court is] called on to consider have arisen in a more concrete and final form." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (noting that the ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"). Determining whether a case satisfies the prudential ripeness doctrine entails a two-fold inquiry requiring a court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court considerations." *Murphy*, 387 F.3d at 347 (quoting *Abbott Labs.*, 387 U.S. at 149). The "fitness" portion of the inquiry "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development," while the "hardship" element requires a "gaug[ing of] the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined." *Murphy*, 402 F.3d at 347. "Both aspects of the inquiry involve the exercise of judgment, rather than the application of a black-letter rule." *Nat'l Park Hospitality Assoc. v. Dept. of the Interior*, 538 U.S. 803, 814 (2003) (Stevens, J., concurring).

45

The claim asserted in Count I satisfies neither element of the prudential ripeness test. Insofar as fitness is concerned, Count I entails statutory construction issues, and thus legal issues that are ordinarily fit for judicial determination. *See Abbott Labs.*, 387 U.S. at 149. However, as discussed above, the Court believes that further development of the record would assist a court in deciding the questions presented in Count I. *See Motor Vehicle Mfrs. Ass'n v. N.Y. Dept. of Envtl. Conservation*, 79 F.3d 1298, 1305 (2d Cir. 1996) ("The ripeness doctrine prevents courts, 'through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies . . . .'" ) (quoting *Abbott Labs.*, 387 U.S. at 148-49). Indeed, the State has conceded that some questions of fact are relevant to Count I when it stated in its brief that "[w]ith regard to the first factor [of the ripeness test], the State's two primary claims are *almost* entirely legal in nature." State's Opp'n to the Sec.'s Mot. to Dismiss [doc. # 25] at 21 (emphasis added). At the very least, knowing whether the State will have to spend its own money in order to comply with the requirements imposed by the Act will determine whether a court even needs to decide the statutory question posed in Count I. For if, as the Secretary asserts, the State can satisfy the testing requirements of the Act in a manner that is fully funded by the federal Government, there would be no need for a court to decide which party has correctly construed the Unfunded Mandates Provision.

Furthermore, having some concrete action by the Secretary to review can only enhance judicial decisionmaking regarding the important issues raised in this case. In *Air Espana v. Brien*, 165 F.3d 148 (2d Cir. 1999), the Second Circuit noted that the "APA explicitly requires that an agency action be final before a claim is ripe for review." *Id.* at 152. The court went on to state that

> [a]s a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature. And second, the

46

action must be one by which rights or obligations have been determined or from which legal consequences will flow.

165 F.3d at 152 (quoting *Top Choice Distribs., Inc. v. U.S. Postal Serv.*, 138 F.3d 463, 466 (2d Cir. 1998). Here, insofar as Count I is concerned, no actions taken by the Secretary either mark the consummation of the agency's decisionmaking process or mark a point at which obligations have been determined or from which legal consequences will flow. Rather, in Count I, the State simply asks the Court to issue a general declaratory judgment not grounded in any concrete agency action, (unlike the claims in Counts III and IV, for example).[18]   *See Motor Vehicle Mfrs Ass'n*, 79 F.3d at 1305 (the ripeness doctrine "'[protects] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'") (quoting *Abbott Labs.*, 387 U.S. at 148-49).

Even if the Court were to somehow construe the Secretary's statements regarding the Unfunded Mandates Provision as "final agency action," the Supreme Court's admonition in *National Park Hospitality Association*, 538 U.S. 803, rings especially true in this case: There, the Supreme Court stated that "[a]lthough the question presented here is 'a purely legal one' and . . . constitutes 'final agency action' . . . we nevertheless believe that further factual development would 'significantly advance our abilities to deal with the legal issues presented.'" *Id.* at 812. Because this Court strongly believes that "'consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to apply and/or enforce the regulation,'" *Nutritional*

---

[18]   In addressing the ripeness issue in the State's Opposition to the Secretary's Motion to Dismiss [doc. # 25], the State merges its four counts, citing the Secretary's denial of the State's waiver request as evidence of final agency action. *Id.* at 22. The Secretary's denials of waiver requests, however, are the focus of Count III of the Complaint, not Count I. Indeed, if the State is correct in its interpretation of the Act, it has no need for a waiver.

*Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998) (quoting *Gardner v. Toilet Goods Assoc.*, 387 U.S. 167, 171 (1967)), the Court concludes that Count I does not satisfy the fitness element of the prudential ripeness test.

Regarding the hardship prong of the prudential ripeness test, the Second Circuit teaches that in "assessing the possible hardship to the parties resulting from withholding judicial resolution, [a court] ask[s] whether the challenged action creates a direct and immediate dilemma for the parties. . . . *The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.*" *Simmonds*, 326 F.3d at 360 (emphasis added). The State remains in compliance with the Act and therefore faces no imminent enforcement action by the Secretary. Moreover, it is not certain what enforcement action, if any, the Secretary would ultimately take, assuming the Secretary were ever to find the State not in compliance. Finally, as noted previously, according to the Secretary, the State may maintain its compliance with the Act and at the same time pursue its interpretation of the Act in the context of a denial of a plan amendment. *See Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 28 (2d Cir. 1984) (finding no particular hardship under ripeness analysis because there were alternative avenues for administrative review). As a result, the State cannot satisfy the hardship prong of the prudential ripeness doctrine.

Therefore, even if the Court were wrong in its conclusion regarding the availability of pre-enforcement review under the Act, the Court would nonetheless dismiss Count I under the doctrine of prudential ripeness. Accordingly, the Court grants the Secretary Motion to Dismiss [doc. # 18] as to Count I under Rule 12(b)(1) for lack of subject matter jurisdiction.

## B. Count II – Spending Clause and Tenth Amendment

In Count II, the State asserts that the Secretary's interpretation and implementation of the Act

violate both the Spending Clause and the Tenth Amendment of the U.S. Constitution.  It will aid the analysis to describe in greater detail the State's constitutional claims.

Through its powers under the Spending Clause of the Constitution, *see* U.S. Const. art. I, § 8, Congress may "attach conditions on the receipt of federal funds" provided to the State so long as: (1) the exercise of the spending power is in pursuit of the "general welfare;" (2) the conditions on funding are laid out "unambiguously . . . enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation;" (3) the conditions are not "unrelated to the federal interest in particular national projects or programs;" and (4) the Spending Clause power is not "used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 206-08.  In a recent decision, the Supreme Court reiterated the requirement that any funding condition enacted under Congress's spending power must be "set out 'unambiguously.'" *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 126 S. Ct. 2455, 2459 (2006) (citing *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  Noting that "[l]egislation enacted pursuant to the spending power is much in the nature of a contract," the Supreme Court stated that "recipients of federal funds must accept them voluntarily and knowingly." *Id.* (internal quotations omitted).  Moreover, the Supreme Court, in considering whether the funding conditions were ambiguous, stated that it must view the conditions "from the perspective of a state official . . . ." *Id.*

In Count II, the State asserts that it accepted federal funding under the Act on the express understanding that the Unfunded Mandates Provision would ensure that all of the costs of complying with the Act's "mandates" would be paid for by the federal Government.  According to the State, the Secretary's interpretation of the Unfunded Mandates Provision has "chang[ed] one of the conditions pursuant to which States accepted funding under the [the Act] . . . thereby precluding the State from

exercising its choice to participate in the . . . Act knowingly, cognizant of the consequences of its participation."  Compl. [doc. # 81] ¶ 191.

Unlike its Spending Clause claim, the State's theory of constitutional violation under the Tenth Amendment focuses not on the Unfunded Mandates Provision, but rather on potential penalties that the State would face should the Secretary find it not in compliance with the Act.  In *Dole*, the Supreme Court, in *dicta*, revived a proposition from a 1937 case, *Steward Machine Co. v. Davis*, 301 U.S. 548, 590, that "in some circumstances[,] the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211.[19]  In its Tenth Amendment claim, the State asserts that if it does not comply with the testing requirements of the Act, the Secretary has the authority to withhold all of its Title I funding, as well as large amounts of funding for other "unrelated" programs–including drug-free schools, after-school programs and literacy for parents.  Such action could amount to hundreds of millions of dollars, or up to 5% of overall education spending in the State and as much as 15% of spending in the most disadvantaged school districts.  Compl. [doc. # 81] ¶ 64.  These penalties, the State asserts, are "so harsh and unrelated to the conditions upon which the State accepted the funds that they violate the Tenth Amendment."  *Id*. ¶ 192.

As should be apparent from the foregoing discussion, Counts I and II are a pair.  In both, the

---

[19]  The circuits are split on the vitality and boundaries of the *Dole* coercion doctrine. The Ninth, Tenth, and D.C. Circuits have declined to attempt to police the boundary between coercion and encouragement.  *See Kansas v. United States*, 214 F.3d 1196, 1201-02 (10th Cir. 2000); *California v. United States*, 104 F.3d 1086, 1092 (9th Cir. 1997); *Oklahoma v. Schweiker*, 655 F.2d 401, 414 (D.C. Cir. 1981).  The First, Third, Fourth, Fifth, and Eighth Circuits, however, have been reluctant to dismiss coercion claims out of hand.  *See Pace v. Bogalusa City School Bd.,* 403 F.3d 272, 278-79 (5th Cir. 2005); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 128-29 (1st Cir. 2003); *A.W. v. Jersey City Pub. Schools*, 341 F.3d 234, 241 (3d Cir. 2003); *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000); *Virginia Dept. of Educ. v. Riley*, 106 F.3d 559, 561 (4th Cir.1997).

State seeks a pre-enforcement declaratory ruling from the Court that the Secretary is wrong; Count I alleges that her interpretation of the Act violates the statute itself, while Count II claims that if her interpretation of the Act is correct, the Act, as so interpreted, violates the Constitution.   In accordance with its discussion of Count I, the Court concludes that *Thunder Basin* also applies to Count II and precludes a pre-enforcement constitutional challenge to the Secretary's interpretation of the Act.   In this regard, the Court notes that the presence of constitutional questions, which an administrative agency has no particular expertise to resolve, does not diminish the application of *Thunder Basin* to this case.   For, as in this case, the mine operator in *Thunder Basin* also challenged the agency's interpretation on constitutional (as well as statutory) grounds.   Yet the Supreme Court had little difficulty concluding that because the mine operator's constitutional claims could (like its statutory claims) be "meaningfully addressed" by the court of appeals, there was no reason to excuse the failure to comply with the enforcement scheme provided by the Mine Act.  *See Thunder Basin*, 510 U.S. at 215; *Doe*, 432 F.3d at 1263; *Nat'l Taxpayers Union*, 376 F.3d at 242; *E. Bridge, LLC*, 320 F.3d at 91.

Moreover, as was true of its statutory claims, the State's constitutional claims are not" wholly collateral" to the Act's enforcement scheme.  *See Thunder Basin*, 510 U.S. at 212.   The State's Spending Clause argument is tied directly to the Secretary's interpretation of the Act.   For if the Secretary and State agreed on the Act's obligations, there would be no Spending Clause claim.   Thus, the Court must carefully analyze both the Secretary's and State's interpretation of the Act, and compare those interpretations to the statutory language of the Act, in order to determine the validity of the State's Spending Clause argument.   Because resolution of the State's Spending Clause claim requires a particularized analysis of the language and implementation of the Act, the claim is not

wholly collateral to the enforcement scheme provided by Congress. *See Gen. Elec. Co. v. EPA*, 360

F.3d 188, 192 (D.C. Cir. 2004) (noting difference between "systemic and particularized challenges"

to agency action in considering whether federal jurisdiction exists); *cf. McNary v. Haitian Refugee*

*Ctr., Inc.*, 498 U.S. 479, 496–98 (1991) (holding that the federal district court had jurisdiction over

an action in which respondents alleged that an agency had engaged in a pattern and practice of due

process violations).

It should be readily apparent that the State's Tenth Amendment claim is also not wholly

collateral to the Act's enforcement scheme; to the contrary, the State's claim is wholly *dependent* on

that mechanism. GEPA provides the Secretary with broad discretion to impose penalties of widely

varying magnitudes. *See* 20 U.S.C. § 6311(g)(2) (authorizing the Secretary to "withhold funds for

State administration . . . until the Secretary determines that the State has fulfilled those

requirements"); 20 U.S.C. § 1234d(a) (authorizing the Secretary to "withhold from a recipient, *in*

*whole or in part*, further payments (including payments for administrative costs)") (emphasis added).

And because Connecticut remains in compliance with the Act, the Secretary has had no occasion to

withhold, or even threaten to withhold, funds. Thus, the record does not reveal the size of the

penalty that the State might face should it become non-compliant.[20]  If, for example, the Secretary

decided to withhold only a nominal amount from the State, there could be no serious claim under

---

[20] Neither party appears to dispute the maximum amount that may be withheld by the Secretary under GEPA. *See* Compl. [doc. # 81] ¶ 67; Reply in Supp. of Def.'s Mot. to Dismiss [doc. # 28] at 17 ("[T]he Secretary does not contest the State's description of the federal 'inducements' and 'conditions' at issue here . . . ."). While the maximum amount may not be in dispute, the Secretary certainly has the discretion to withhold less, *see, e.g.*, Def.'s Mem. Regarding Issues Raised at Apr. 28, 2006 Conf. [doc. # 65] at 16-17 (offering "not to suspend program funds pending the administrative hearing"). Therefore, any potential amount to be withheld is purely hypothetical at this point.

the Tenth Amendment.  As the Fourth Circuit explained in *West Virginia v. U.S. Deptartment of Health and Human Services*, 289 F.3d 281 (4th Cir. 2002), the Secretary's authority to craft a penalty that is proportionate to the non-compliance dooms any facial challenge to an agency's penalty powers.  Here, as in *West Virginia*, "[w]hile it is certainly possible that, in a given case, the sanction actually imposed by the Secretary might not be proportionate to the breach and might be constitutionally suspect, the mere possibility of a constitutional violation is insufficient to sustain a facial challenge to a statute." *Id.* at 292-293; *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("The fact that the . . . Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."); *Murphy*, 402 F.3d at 354 (stating that courts should "ensure[] that all non-constitutional avenues of resolution have been explored first, perhaps obviating the need for judicial entanglement in these constitutional disputes").

Therefore, in accordance with *Thunder Basin*, the Court concludes that it lacks subject matter jurisdiction over the State's claims in Count II.  Moreover, as was true of Count I, even if the Court were wrong in this regard, the Court would nonetheless dismiss the State's claims in Count II on the basis of the prudential ripeness doctrine.  *See supra* Subsection IV.A.3.  The Court believes that the development of an administrative record would greatly benefit the Court in reaching its decision, even on the constitutional issues.  As the Second Circuit has observed, "[p]rudential ripeness is . . . a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Simmonds*, 326 F.3d at 357.  Accordingly, the Court GRANTS the Secretary's Motion to Dismiss

[doc. # 18] as to Count II for lack of subject matter jurisdiction.

## C. Count III–Denial of Waivers and Abdication

In Count III, the State challenges the Secretary's denial of the State's request for waivers pursuant to 20 U.S.C. § 7861.  The State's challenge rests on two grounds.  First, the State alleges that the Secretary's denial of the waivers was arbitrary and capricious under the APA.  Compl. [doc. # 81] ¶¶ 196, 199.  Second, the State alleges that the Secretary abdicated her statutory responsibilities to "meaningfully consider" state waiver requests by announcing a policy of flatly refusing to consider any waivers that sought approval of alternative-grade formative testing.  *Id.* ¶ 198.  The State's abdication claim is limited to the Secretary's alleged policy with regard to alternative-grade formative testing.  *Id.*

In her Motion to Dismiss [doc. # 18], the Secretary counters that her decision to deny the State's waiver requests is a decision "committed to the agency" and therefore not reviewable by the Court.  *See* Mem. in Supp. of Def.'s Mot. to Dismiss  [doc. # 18] at 51-55.  In addition, the Secretary responds to the State's abdication of statutory responsibilities claim by stating that she did not fail to "meaningfully consider" the State's waiver requests on alternative-grade formative testing, *see* Def.'s Mem. Regarding Am. Compl. [doc. # 50] at 18-24. The Court agrees with each of the Secretary's arguments.

### 1. Denial of Waivers

The State first claims that the Secretary acted arbitrarily and capriciously in denying the State's waiver requests in violation of 5 U.S.C. § 706(2).  The APA permits judicial review for "[a] person suffering legal wrong because of agency action," *id.* § 702, but the statute explicitly excludes review "to the extent that–(1) statutes preclude judicial review; or (2) agency action is committed

to agency discretion by law," *id*. § 701(a).  It is the second exclusion that is pertinent to this case.

In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme Court explained that even "where Congress

has not affirmatively precluded review" under § 701(a)(1), § 701(a)(2) precludes review "if the

statute [governing the agency's actions] is drawn so that a court would have no meaningful standard

against which to judge the agency's exercise of discretion." 470 U.S. at 830.  The committed-to-

agency-discretion exception is a "'very narrow exception' to the general grant of jurisdiction [and]

is 'applicable in those rare instances where statutes are drawn in such broad terms that in a given case

there is no law to apply.'"  *Christianson v. Hauptman*, 991 F.2d 59, 62 (2d Cir. 1993) (quoting

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410 (1971)).

    The Court is acutely aware that no clear standard exists to determine what statutory language

is sufficient to find that a decision is committed to agency discretion.  *See* Charles H. Koch, Jr.,

*Administrative Law and Practice*, § 13.3[1] (2d ed. 1997) ("It is unclear how compelling the

potential standards must be in order to preclude review and some soft language has been considered

insufficient to support review.").  Nevertheless, drawing what guidance it can glean from decisional

law, the Court concludes that the language of the provision governing waivers grants the Secretary

broad discretion to deny states' waiver requests and does not provide any standard–let alone a

meaningful one–that a court could use to assess the Secretary's denial of a particular waiver request.[21]

    Section 7861 of the Act reads in pertinent part as follows: "[T]he Secretary may waive any

statutory or regulatory requirement of this chapter."  20 U.S.C. § 7861(a).  The statute provides no

---

[21]  The Court has no occasion in this case to decide whether the Secretary's *grant* of a waiver
request would be judicially reviewable.  *See Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994)
(reviewing grant of a waiver for compliance with statutory standards).  Therefore, nothing in this
decision should be construed as providing a view one way or the other on that question.

further guidelines or guidance for the Secretary in deciding whether to deny a waiver request.  The statute does include specific guidelines as to what information a waiver request must include. Requests must describe "for each school year, specific, measurable educational goals . . . that would be affected by the waiver and the methods to be used to measure annually such progress for meeting such goals." 20 U.S.C. § 7861(b)(1)(C).  The Act, however, does not require the Secretary to grant a waiver if these minimum elements are included in a request.  It seems clear, therefore, that Congress intended the Secretary to have broad and unfettered discretion to decide that a state should not be relieved of its obligations to comply with the statutory requirements imposed by Congress.

The Court's conclusion that the Act contains no standard governing the denial of a waiver request is fortified by other portions of the Act's waiver section that provide specific limitations on and guidance regarding the Secretary's ability to *grant*, *extend or terminate* waivers.  The statute explicitly prevents the Secretary from granting requests to waive a number of the Act's requirements. *See id.* § 7861(c).  The Act also allows the Secretary to grant a waiver *extension* only if the Secretary "determines that–(A) the waiver has been effective . . . and the waiver has contributed to improved student achievement; and (B) the extension is in the public interest." *Id.* § 7861(d)(2).  Furthermore, the Act requires the Secretary to report to Congress, "summarizing the use of waivers" and "describing whether the waivers–(i) increased the quality of instruction to students; or (ii) improved the academic achievement of students." *Id*. § 7861(e)(4)(A)-(B).  And most significantly, the Act allows the Secretary to *terminate* a waiver only if the "Secretary determines, after notice and an opportunity for a hearing, that the performance of the State . . . has been inadequate to justify a continuation of the waiver or if the waiver is no longer necessary to achieve its original purpose." *Id*. § 7861(f).  Clearly, therefore, Congress knew how to cabin the Secretary's discretion in reviewing

waiver requests when it wished to do so.  Yet, the statute provides no restrictions on or guidance

regarding the *denial* of waivers.

The House Report on the Act's waiver provisions states that "the Secretary's waiver authority

is generally consistent with the waiver authority granted to States under the Education Flexibility and

Partnership Act ['EFPA']."  *See* H.R. Rep. 107-63 at 368 (2001).   The EFPA waiver provision in

turn provides, in part, as follows:

> The Secretary may approve an application [for a waiver] . . . only if the Secretary
> determines that such application demonstrates substantial promise of assisting the
> State educational agency . . . in carrying out comprehensive educational reform, after
> considering . . . the ability of the [waiver] to ensure accountability . . . [and] the
> significance of the . . . statutory or regulatory requirements relating to education that
> will be waived.

20 U.S.C. § 5891b(a)(3)(B).  Similar to the No Child Left Behind Act, the EFPA places conditions

only on the granting of waivers, not on their denial.

"[W]here the language of the statute is not in itself sufficient evidence of whether Congress

intended to grant unreviewable discretion, the court will look to other indications of congressional

intent[,] [including] the nature of the agency action involved . . . ."  *N.Y. Racing Ass'n, Inc. v.

N.L.R.B.*, 708 F.2d 46, 51 (2d Cir. 1983).  Here, the State requests a waiver from three specific

statutory requirements in the Act.  By denying the State's waiver requests, the Secretary has merely

decided that Connecticut must continue to comply with these requirements, like every other state.

That is, when the Secretary denies a waiver request, the default is merely compliance with the Act.

It seems eminently sensible that Congress would have wanted to restrict the ability of the  Secretary

to release states from their statutory obligations, but would not have wanted to place any restrictions

on the Secretary's right to insist on state compliance with the directives Congress itself imposed in

the Act.  It is also doubtful in the extreme that Congress would have wanted or expected a court

battle every time the Secretary merely decided that a state should continue to comply with the Act.

Case law also supports the Court's conclusion that the Secretary's decision to deny a waiver

request is committed to agency discretion and thus not reviewable.  For example, the Second Circuit

has on a number of occasions held, or cited with approval another circuit's holding, that there is no

judicial review in circumstances that are similar to that presented by the Secretary's denial of waiver

requests under the Act:

* A statute vested the decisionmaker with authority to make all substantive and procedural rules for resolving claims under the September 11 Victim Compensation Fund.  *Schneider v. Feinberg*, 345 F.3d 135, 149 (2d Cir. 2003).

* A statute authorized the Director of the United States Information Agency to make a recommendation to the Attorney General to waive the requirement that a J-1 visa holder return to his or her home country before applying for permanent residence in the U.S. upon a finding that such return would "impose exceptional hardship upon the alien's [U.S. citizen or resident] spouse or child."  *Dina v. Att'y Gen. of U.S.*, 793 F.2d 473, 476 (2d Cir. 1986).

* A statute simply instructed an agency official to reconsider any program vetoed by the Governor and assess whether the program was "fully consistent with the provisions and in furtherance of the purposes of the statute."  *East Oakland-Fruitvale Planning Council v. Rumsfeld*, 471 F.2d 524, 528, 533 (9th Cir. 1972), *cited with approval in Greater N.Y. Hosp. Ass'n v. Mathews*, 536 F.2d 494, 498 (2d Cir. 1976).

* A statute stated only that "each provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly)." *Mathews*, 536 F.2d at 497 (internal quotation omitted).

* A statute granting the National Labor Relations Board authority to regulate industries involved in interstate commerce but also providing the agency discretion to decline jurisdiction if "the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." *N.Y. Racing Ass'n Inc.*, 708 F.2d at 51 (citing 29 U.S.C. § 164(c)).

To support its argument that the Secretary's denial of a waiver request is reviewable, the State principally relies upon the Second Circuit's holding in *Christianson*, 991 F.2d 59.[22]  In *Christianson*, Congress created the Fire Island National Seashore ("Fire Island") and authorized the National Park Service (the "Park Service") to manage it, instructing the Secretary of the Interior to "administer and protect the Fire Island National Seashore with the *primary* aim of conserving the natural resources located there.'"  *Id.* at 63 (citing 16 U.S.C. § 459e-6(a)).  The Park Service then promulgated a rule prohibiting use of planes on Fire Island, but certain communities on the island were exempted from that prohibition.   Years later, allegedly at the behest of the citizens of one of the exempted communities, the Park Service conducted a notice and comment rulemaking to remove the community's exemption.  *Id.* at 61.  A resident who opposed the removal of the exemption asked for a reconsideration, which was denied by the Park Service.  The resident later challenged the removal of the exemption and the Park Service's refusal to reconsider in court.  *Id.*  The Second Circuit held that the agency's action in removing the exemption could be reviewed under the APA in accordance with the language in the Fire Island statute.  *Id.* at 62-63.

*Christianson* is distinguishable from this case on several grounds.  In *Christianson*, the agency promulgated a rule under its general agency authority to remove an exemption; it did not act pursuant to any specifically granted authority by Congress.  *Id.* at 61-62.  Here, by contrast, Congress specifically vested the Secretary with the authority to waive requirements of the Act, limiting her

---

[22]  The State also cites *Dickson v. Sec'y of Defense*, 68 F.3d 1396 (1995).  There, the D.C. Circuit held that a statute providing that the Secretary of a military department "may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice" was reviewable and not committed to agency discretion.  However, the court relied on the "interest of justice" standard included within the statute to guide its review of the Secretary's action.  *See id.* at 1403-04.  As noted above, the portion of the Act dealing with denial of waivers contains no such standard and therefore is distinguishable from the statute in *Dickson*.

exercise of discretion to grant waivers but leaving completely unfettered the Secretary's discretion to deny a waiver. Relatedly, the waiver request in *Christianson* involved a request for a reprieve from a prior agency regulation; here, by contrast, the State seeks relief from a specific statutory requirement.

The Second Circuit in *Christianson* also seemed especially troubled by the fact that, if the court "were to accept the [Park] Service's argument, we would be unable to judicially review such actions. In our society, judicial review provides an important escape route from bureaucracy's iron cage." *Id*. at 63. Here, other avenues exist for the State's claims to be heard, even if the Secretary's denial of waivers is unreviewable. For example, GEPA provides for judicial review in the context of an enforcement action. Also, the Secretary has acknowledged that her denial of a plan amendment is reviewable under the APA because there are statutory standards a court can apply in reviewing such a decision. *See* Def.'s Mem. Regarding Issues Raised at Apr. 28, 2006 Conf. [doc. # 65] at 17 (citing 20 U.S.C. § 6311(e)(1)(F) (stating that the Secretary shall "have the authority to disapprove a State plan for not meeting the requirements of this part")).

Finally, while the Court acknowledges that *Christianson* could be read as expansively as the State seeks to read it, it is notable that no court has ever cited *Christianson* for such an expansive interpretation of the committed to agency discretion exception in the APA.[23]

---

[23] The State also relies on the holdings in two district court cases where the courts found agency decisions to be reviewable. *See* State's Supplemental Br. in Supp. of Def.'s Mot. to Dismiss on Matters Raised During the Apr. 28, 2006 Oral Argument [doc. # 64] at 15 (citing *George Campbell Painting Corp. v. Chao*, No. 3-05-CV-00716(JCH), 2006 WL 197375 (D. Conn. Jan. 25, 2006); *M&T Mortg. Corp. v. White*, No. 04CV4775NGGVVP, 2006 WL 47467 (E.D.N.Y. Jan. 9, 2006)). These cases are also distinguishable. In *George Campbell Painting Corp.*, the court noted that the Department of Labor must consider numerous, specific factors in determining whether laborers were underpaid, thereby allowing the court to review whether the agency properly considered those factors. *See George Campbell Painting Corp.*, 2006 WL 197375, at *5. Here, as

To construct a standard by which a court could meaningfully review the Secretary's decision to deny a waiver of the Act's requirements, the Court would be required to rewrite the waiver provision of the Act for Congress and guess at the precise contours of such a standard. Would it be unlawful to deny a waiver if a state could prove that its request would better educate its students? Or, would it be unlawful to deny a waiver so long as a state could show that its request would not inflict harm and might, if tried, do some good? Or, would it be unlawful to deny a waiver if the state could show its request would be equally effective but less costly, thereby allowing scarce resources to be spent on other educational programs? The Court could go on and on. The point is that there is no reason why this Court should create standards governing the Secretary's denial of a waiver that Congress itself chose not to impose. As the Second Circuit reiterated in *Lunney v. United States*, 319 F.3d 550 (2d Cir. 2003), "'[t]he danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance. That decision is in the first instance for Congress, and [a court must] . . . determine whether in this case Congress has provided [it] with law to apply.'" *Id.* at 558 (quoting *Chaney*, 470 U.S. at 834 (internal quotations omitted)). In this case, Congress has provided no law to apply when the Secretary denies a waiver. Accordingly, the Secretary's denial of waiver requests is not reviewable by the Court under 5 U.S.C. § 701(a)(2).

### 2. Abdication of Statutory Responsibilities

The State also alleges that the Secretary abdicated her statutory responsibilities by adopting

---

noted above, no such factors exist for denials of waivers. In *M&T Mortg. Corp.*, the court used a broad statutory standard to review whether HUD improperly endorsed a mortgage lender. *See M&T Mortg. Corp.*, 2006 WL 47467, at *7-*10. However, the type of agency action in *M&T* is markedly different from the Secretary's decision to deny a waiver from a specific statutory requirement.

a policy of flatly refusing even to consider waiver requests pertaining to alternative-grade formative

testing.  Compl. [doc. # 81] ¶ 198.  The abdication of statutory responsibilities theory was first

mentioned in *Chaney*, 470 U.S. 821.  There, the Supreme Court held that the Federal Drug

Administration's refusal to institute enforcement proceedings was not subject to judicial review

under 5 U.S.C. § 701(a)(2), since that agency's decision was "committed to agency discretion by law"

and the statute in question did not provide guidelines for the agency to follow in exercising that

discretion.  *Id.* at 832-33.  In a footnote, however, the Supreme Court made the following remark:

> We do not have in this case a refusal by the agency to institute proceedings based
> solely on the belief that it lacks jurisdiction.  Nor do we have a situation where it
> justifiably could be found that the agency has "consciously and expressly adopted a
> general policy" that is so extreme as to amount to an abdication of its statutory
> responsibilities.  *See, e.g.*, *Adams v. Richardson*, 156 U.S. App. D.C. 267, 480 F.2d
> 1159 (1973) (en banc).  Although we express no opinion on whether such decisions
> would be unreviewable under § 701(a)(2), we note that in those situations the statute
> conferring authority on the agency might indicate that such decisions were not
> "committed to agency discretion."

*Id.* at 833 n.4.  The Supreme Court has never revisited this issue in over twenty years.  It is this

footnote that is the source of the State's claim to judicial review in this case.

Recently, in *Riverkeeper, Inc. v. Collins*, 359 F.3d 156 (2d Cir. 2004), the Second Circuit had

occasion to consider this footnote from *Chaney*.  In *Riverkeeper*, the plaintiff did not dispute that the

agency's decision was committed to agency discretion by law, but instead invoked the *Chaney*

footnote and argued that the court nonetheless had jurisdiction to review the agency's decision

because the agency had consciously and expressly adopted a policy so extreme as to amount to an

abdication of statutory responsibilities.  At the outset, the Second Circuit observed that "[n]o party

has directed us to, nor can we locate, a decision by a court of appeals that has found, in performing

the *Chaney* analysis, a federal agency to have abdicated its statutory responsibilities."  *Id.* at 170

62

n.17.  That is the case here as well; the State has not cited a single decision in which a court utilized the *Chaney* footnote to strike down an agency action that was otherwise committed to its discretion by law.

*Riverkeeper* went on to state that "even if we assume that the *Chaney* Court established by way of footnote 4 federal jurisdiction over appeals from agency action" in cases involving abdication of statutory responsibilities, there was no abdication in that case.  *Riverkeeper, Inc.*, 359 F.3d at 170. The court's analysis in *Riverkeeper* provides valuable guidance for this case.  The plaintiffs in *Riverkeeper* alleged that the agency had failed to enforce a condition of licensing and by doing so, had abdicated an express statutory requirement to ensure that licensed activities would adequately protect public health and safety.  In assessing that claim, the Second Circuit held that the agency "can be viewed as abdicating its statutory duties . . . only if it has established a policy not to protect adequately public health and safety . . . ." *Id.* at 168.  Put another way, only if a plaintiff could show that an agency had "indisputable proof" that the general purpose of the relevant statute was not being met "and nonetheless decided it would do nothing to address the situation, [the plaintiff] might then plausibly charge that [the agency] had 'abdicated' its statutory responsibility." *Id.* at 168.  In a footnote accompanying that text, the Second Circuit cited with favor the following statement from the Fifth Circuit: "'Real or perceived inadequate enforcement of [the] laws does not constitute a reviewable abdication of duty.'" *Id.* at 168 n.15 (quoting *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997)).  Because the plaintiff in *Riverkeeper* could not satisfy the understandably high standard established by the Second Circuit, the court  affirmed the dismissal of the plaintiff's claim for lack of jurisdiction.

The State's allegations in this case fare no better than those in *Riverkeeper*.  The overall

purpose of the Act is "to ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging state academic achievement standards and state academic assessments."  20 U.S.C. § 6301.  In its Complaint, the State alleges that the Secretary "has made numerous public statements that testing in every grade (for grades 3 through 8) is one of the 'bright lines' and the 'linchpin' of the . . . Act, and indicated that requests to waive the requirement would not even be considered."  Compl. [doc. # 81] ¶ 132.  But there is no allegation that the Secretary possesses "indisputable proof" that a failure to allow alternative-grade formative testing will deny children a fair, equal, and significant opportunity to obtain a high-quality education.

To be sure, the Secretary and the State disagree about how best to implement the goals of the Act.  But that policy disagreement can hardly be labeled an abdication of the Secretary's responsibilities.  As *Riverkeeper* recognized, "[w]ere it otherwise, we would be reading the *Chaney* footnote to have created jurisdiction on an 'abdication' basis every time an administrative agency declines to order demanded action on an asserted discrete, perceived problem within its area of statutory responsibility."  359 F.3d at 170.  Nor can the State plausibly claim that the Secretary did not even consider the State's waiver requests.  The correspondence between the Secretary and the State that is referenced in the State's Complaint shows that the State and Secretary had a number of discussions about the basis of the State's request and the Secretary's rationale in rejecting it.  Compl. [doc. # 81] ¶¶ 105, 120, 126, 133, 143, 145, 147, 149, 151.  Once again, a quote from *Riverkeeper* aptly captures the situation here:

> The *Chaney* Court made clear the strict limitations on the judicial power to review administrative agency decisions.  We are confident that in thus shutting the front door to the federal courts, it did not mean to open a back door permitting federal courts to

> assert jurisdiction whenever a specific problem is brought to an agency's attention
> and the agency decides not to order demanded curative steps with respect to it.  Such
> an exception . . . would threaten to devour the rule.

*Riverkeeper*, 359 F.3d at 169.

Accordingly, the Court grants the Secretary's Motion to Dismiss [doc. # 18] Count III for lack of subject matter jurisdiction.

### D. Count IV – Denials of Plan Amendments

The State added Count IV to its Complaint in its most recent filing.  Compl. [doc. # 81] ¶¶ 200-206.  Count IV also asserts an APA claim.  It alleges that the Secretary acted arbitrarily and capriciously in denying the State's request for plan amendments and that she violated 20 U.S.C. § 6311(e)(1)(E) when she failed to provide an adequate hearing prior to rejecting the State's proffered plan amendments.  Both parties agree that the State filed a plan amendment regarding the testing of ELL students, *see* Compl. [doc. #81] ¶¶ 147, 148; Def.'s Mem. Regarding the State's Second Am. Compl. [doc. # 83] at 2-3, and the State never filed a plan amendment regarding formative testing in alternate years,  *see* Compl. [doc. #81] ¶¶ 147, 148.  There may be some dispute between the parties on whether the State has submitted a plan amendment with respect to special education students, but the Court sees no need to resolve that dispute at this time.  *See* Compl. [doc. #81] ¶¶ 148, 151; Def.'s Mem. Regarding the State's Second Am. Compl. [doc. # 83] at 2-3.[24]

Unlike the other counts of the Complaint, the Secretary does not contend that this Court lacks

---

[24] The Secretary has previously misidentified waiver requests as plan amendments, *see* Compl. [doc. # 81] ¶¶ 147, 148, 151, and asserted that waiver requests "will be considered according to the process we have established for amendments to accountability plans."  Letter from Secretary Spellings to Commissioner Sternberg (May 3, 2005) at 3.  Therefore, as Count IV proceeds forward, the parties will have to clarify the precise scope of the state plan amendments that are properly at issue in Count IV.

subject matter jurisdiction over the claims asserted in Count IV. *See id.* [doc. # 83] at 2-3. Instead, the Secretary asks the Court at this very preliminary stage of the case to reject the State's claim as a matter of law on the face of the State's Complaint. According to the Secretary, she was bound as a matter of law to reject the State's plan amendments. *See id.* [doc. # 83] at 16-18. Needless to say, the State vigorously disputes the Secretary's arguments on the merits.

As should be apparent, the Court is not in any position to reach any decision on the validity of the claims asserted in Count IV until the Court conducts a detailed analysis of the plan amendments in question, the requirements of the Act regarding plan amendments, and the Secretary's reasons for rejecting the State's plan amendments. That will require, at a minimum, a compilation of the administrative record, since the State's claim in Count IV is an administrative appeal from the Secretary's denial of the plan amendments and therefore the Court's review is confined to the administrative record. *See Riverkeeper*, 359 F.3d at 184. It would certainly be premature to rule on the merits of the State's administrative appeal before the parties themselves have compiled and filed the relevant administrative record.

The Court, therefore, cannot and will not dismiss the State's administrative appeal from the Secretary's denial of the State's plan amendments. The Court emphasizes, however, that it has not as yet made any determination of the precise issues that are properly before it on the State's appeal of the denial of its plan amendments. Thus, nothing in this decision should be construed as determining (one way or the other) whether the State's arguments regarding the Unfunded Mandates Provision and the Constitution are properly before the Court on Count IV. The Court will make that determination only after reviewing the administrative record on the State's plan amendment appeal.

That leaves the State's assertion in Count IV that it was denied a hearing on its proposed plan

amendments in violation of 20 U.S.C. § 6311(e)(1)(E).[25]  In its Complaint, the State requests a declaratory judgment requiring the Secretary to "provide a hearing before she denies a plan amendment."  *See* Compl. [doc. # 81] at 47.  If the Secretary did in fact violate the Act by not providing the State with a hearing, the proper remedy would be a remand for the Secretary to hold a hearing.  *See Fl. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); 33 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice and Procedure § 8313 (2006) ("If a court finds that the agency's procedures are inadequate, it should remand so that the agency may correct its procedures rather than invalidate the substantive decision.").  However, in other portions of its Complaint and in its briefing to the Court, the State has made it clear that it does not want the Court to remand the case to the agency for the hearing requested, but rather asks the Court to rule on the merits of the plan amendments.  *Id*. at 46-48; State's Supplemental Br. in Supp. of Def.'s Mot. to Dismiss on Matters Raised During the Apr. 28, 2006 Oral Argument [doc. # 64] at 13-14 (arguing that pursuing the plan amendment process would be futile).

Given that (1) the State does not seek a remand for the hearing to which it believes it is entitled; (2) the Secretary does not seek a remand; and (3) there are apparently no other plan amendments pending before the Secretary, the Court dismisses the State's claim for violation of § 6311(e)(1)(E) as moot.  The Court emphasizes that in doing so, it does not reach the question of

---

[25]  Section 6311(e)(1)(E) states that the Secretary shall "not decline to approve a State's plan before–(i) offering the State an opportunity to revise its plan; (ii) providing technical assistance in order to assist the State to meet the requirements of [the] subsections . . . of this section; and (iii) providing a hearing; . . ."  20 U.S.C. § 6311(e)(1)(E).

what would constitute a satisfactory hearing under § 6311(e)(1)(E).  That determination is not necessary in this case.  The Court therefore denies in part and grants in part the Secretary's Motion to Dismiss [doc. # 18] as to Count IV.  The Court denies the Motion to Dismiss with respect to the State's claim that the Secretary's denial of its plan amendment violated the APA.  The Court grants the Motion to Dismiss as to the State's claim that the Secretary provided an inadequate hearing because that claim is now moot.

## V.

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the Secretary's Motion to Dismiss [doc. # 18].  The Motion to Dismiss is GRANTED as to Count I, Count II, and Count III in their entirety, as the Court concludes that it lacks subject matter jurisdiction over those claims.  The motion is also GRANTED as to the portion of Count IV that alleges that the Secretary failed to provide the hearing required by the Act, as the Court concludes that this claim is moot.  The Motion to Dismiss is DENIED as to the remaining claims in Count IV.

As a result of this ruling, Count IV is the only remaining count of the State's Complaint.  The parties shall file no later than **October 16, 2006**, a joint report setting forth their proposed schedule(s) for filing the administrative record and for resolving the remaining claims in this action.  Having now determined what claims are before it, the Court orders that any non-party wishing to intervene on the issues in Count IV  must file a motion to intervene and supporting papers no later than **October 16, 2006**.

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: <u>September 27, 2006</u>**.