# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT, ET AL.,  :
            Plaintiffs,     :
                             :
v.                           :      NO. 3:05CV1330(MRK)
                             :
MARGARET SPELLINGS, SECRETARY :
OF EDUCATION,               :
            Defendant.    :

## MEMORANDUM OF DECISION

Pending before the Court are a Motion for Judgment on the Administrative Record [doc. # 133] filed by Plaintiffs, the State of Connecticut and its General Assembly (collectively, the "State"), a Cross-Motion for Judgment on the Record [doc. # 145] filed by Defendant, Margaret Spellings, Secretary of Education (the "Secretary"), and a Cross-Motion for Judgment on the Record and Opposition to Plaintiff's Motion for Judgment on the Record [doc. # 142] filed by Intervenor-Plaintiff, Connecticut State Conference of the NAACP (the "NAACP"). For the reasons explained below, the Court denies the State's Motion [doc. # 133], grants the Secretary's Cross-Motion [doc. # 145], and grants the NAACP's Cross-Motion [doc. # 142].

## I.

The dispute in this case arises under the No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301-7941 (2006) (the "Act"). The facts underlying this dispute are set forth in greater detail in this Court's previous ruling on the Secretary's Motion to Dismiss [doc. # 18] ("Motion to Dismiss Ruling" [doc. # 87]), familiarity with which is assumed. *See Connecticut v. Spellings*, 453 F. Supp. 2d 459 (D. Conn. 2006). In its Motion to Dismiss Ruling, the Court addressed "only the threshold issues relating to its jurisdiction and authority to consider the various claims raised by the State," *id.*

at 465, and dismissed the first three of the State's four counts of its Second Amended Complaint [doc. # 81] because the Court concluded that it lacked jurisdiction over them. *See id.* at 465, 491, 494, 501; *see also Arizona State Dep't of Educ. v. U.S. Dep't of Educ.*, No. CV061719PHXDGC, 2007 WL 433581, at *7 (D. Ariz. Feb. 6, 2007) ("This Court lacks subject matter jurisdiction over this pre-enforcement declaratory judgment action regarding the meaning of § 6316(b)(2)(B).").[1] The Court further declined to address the claims asserted in the State's fourth count, which appealed the Secretary's denials of Connecticut's two proposed plan amendments regarding the timing and method of assessment of two groups of students – special education and Limited English Proficiency ("LEP") students. *See Spellings*, 453 F. Supp. 2d at 464.[2] The Court did so because it "conclude[d] that any

---

[1] Count I sought a declaratory judgment to clarify the meaning of 20 U.S.C. § 7907(a), the so-called "unfunded mandates" provision of the Act, Count II asserted that the Secretary's interpretation of the Act violated the Spending Clause and the Tenth Amendment to the U.S. Constitution, and Count III challenged the Secretary's denials of the State's waiver requests as arbitrary and capricious under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2). *See* Second. Am. Compl. [doc. # 81], at 40-44.

[2] Count IV provides:
"200. The allegations in Paragraphs 1-199 are alleged and incorporated herein by reference.
201. The Secretary's decisions to deny Connecticut its requested plan amendments constitute final decisions of an administrative agency.
202. The Secretary's decisions regarding plan amendments are governed by the standards and purposes established by the NCLB Act.
203. The Secretary's decisions to deny Connecticut its requested plan amendments are unlawful and contrary to constitutional right, power or privilege, are unsupported by the record and violate the Administrative Procedure Act. 5 U.S.C. § 706(2).
204. The Secretary's interpretation of the Unfunded Mandates Provision of the NCLB Act is unlawful and contrary to constitutional right, power or privilege, and her misinterpretation renders her administrative decisions as unlawful and contrary to constitutional right, power or privilege and in violation of the Administrative Procedure Act.
205. In violation of 20 U.S.C. § 6311(e)(1)(E), prior to denying the State's plan amendments, the Secretary failed to provide the State with an opportunity to revise its amendments, technical support or a hearing.
206. The Secretary's decisions to deny Connecticut its requested plan amendments are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, contrary to

consideration of the merits of either party's statutory arguments would require further development of the record." *Id.* at 465; *see also id.* at 501-02.[3]

Following issuance of the Motion to Dismiss Ruling, on July 12, 2007, the Secretary submitted an Amended Certified Administrative Record ("A.C.A.R.") [doc. # 132]. Soon after, the State, the Secretary and the NAACP filed their motions for judgment on the administrative record on Count IV.

## A. Relevant Requirements of the No Child Left Behind Act

In 2001, pursuant to its power under the Spending Clause of the United States Constitution, Art. I, § 8, cl. 1, Congress passed the No Child Left Behind Act, the overriding goal of which, the parties agree, is to ensure high-quality education for all our Nation's children. *See* 20 U.S.C. § 6301. Congress provided that in return for federal educational funds under the Act, States must adhere to a comprehensive set of educational assessments and accountability measures. *See Spellings*, 453 F. Supp. 2d at 469-71 (discussing the Act's requirements in detail). To be eligible for funding under the Act, a State must submit to the Secretary a plan developed by the state educational agency. *See* 20 U.S.C. § 6311(a). Each state plan consists of three primary elements: (1) the adoption of challenging academic content standards and student achievement standards that will be used by the State, its local educational agencies, and its schools, *see* 20 U.S.C. § 6311(b)(1)(A); (2) the

---

constitutional right, privilege or immunity, in excess of statutory jurisdiction, authority or limit, or short of statutory right." Second Am. Compl. [doc. # 81], at 44-45 ¶¶ 200-06.

[3] In its prior ruling, the Court declined to decide whether "the Unfunded Mandates Provision and the Constitution are properly before the Court on Count IV." *Spellings*, 453 F. Supp. 2d at 502. *See generally Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 512 F.3d 252, 253 (6th Cir. 2008) (("We . . . conclude that [the Act] by its terms, fails to provide clear notice of the States' obligation to incur additional costs to comply with the Act's requirements.").

development and implementation of a single, statewide accountability system that will be effective in ensuring adequate yearly progress in achieving objectives for educational improvement, *see* 20 U.S.C. § 6311(b)(2)(A); and (3) the implementation of high-quality, yearly student academic assessments that will include, at a minimum, academic assessments in mathematics, reading or language arts, and science, *see* 20 U.S.C. § 6311(b)(3)(A). *See Spellings*, 453 F. Supp. 2d at 469.

As is relevant to the pending motions, the Act states in regard to the first requirement that "[t]he academic standards . . . shall be the same academic standards that the State applies to all schools and children in the State." 20 U.S.C. § 6311(b)(1)(B). For the second requirement, the Act provides that States must define annual yearly progress in a manner that "applies the same high standards of academic achievement to all . . . students in the State; . . . is statistically valid and reliable; [and] includes separate measurable annual objectives for continuous and substantial improvement for . . . the achievement of . . . students with disabilities [and] students with limited English proficiency." 20 U.S.C. §§ 6311(b)(2)(C)(i), (ii), (v)(II)(cc),(v)(II)(dd). With respect to the third plan requirement, the Act tells States that "the same academic assessments [must be] used to measure the achievement of all children." 20 U.S.C. § 6311(b)(3)(C)(i)-(iii). In assessing the academic progress of students, the Act reiterates that a state must provide for "the participation in such assessments of all students." 20 U.S.C. § 6311(b)(3)(C)(ix)(I). The Act also requires States to provide for "the reasonable adaptations and accommodations for students with disabilities . . . necessary to measure the academic achievement of such students relative to . . . State student academic achievement standards," 20 U.S.C. § 6311(b)(3)(C)(ix)(II), and "the inclusion of [LEP] students, who shall be assessed in a valid and reliable manner and provided reasonable accommodations on assessments administered . . . under this paragraph . . . ." 20 U.S.C.

§ 6311(b)(3)(C)(ix)(III).[4]  LEP students must be tested in English after attending schools in the United States for three years, though case-by-case exceptions can be made.  *See* 20 U.S.C. § 6311(b)(3)(C)(x).

The Act gives the Secretary "the authority to disapprove a State plan for not meeting the requirements" of the Act, but adds that she "shall not have the authority to require a State, as a condition of approval of the State plan, to include in, or delete from, such plan one or more specific elements of the State's academic content standards or to use specific academic assessment instruments or items."  20 U.S.C. § 6311(e)(1)(F).  The Act also anticipates the possibility that a State may wish to modify its plan after initial approval.  In such cases, the Act provides that "[i]f significant changes are made to a State's plan, such as the adoption of . . . new academic assessments . . . such information shall be submitted to the Secretary."  20 U.S.C. § 6311(f)(2); *see Spellings*, 453 F. Supp. 2d at 472.

States receiving funding under the Act are required to use those funds to supplement, and not supplant, funding from non-federal sources used to educate children.  *See* 20 U.S.C. § 6321(b)(1).

---

[4]  Section 6311 states that such assessments shall "(ix) provide for—
(I) the participation of such assessments of all students;
(II) the reasonable adaptations and accommodations for students with disabilities . . . necessary to measure the academic achievement of such students relative to State academic content and State student academic achievement standards; and
(III) the inclusion of limited English proficient students, who shall be *assessed in a valid and reliable manner and provided reasonable accommodations* on assessments administered to such students under this paragraph, including to the extent practicable, *assessments in the language and form most likely to yield accurate data on what such students know and can do in academic content areas, until such students have achieved English language proficiency* as determined under [20 U.S.C. § 6311(b)(7)]."  20 U.S.C. § 6311(b)(3)(C)(ix) (emphasis added).

The so-called "Unfunded Mandates Provision" further states,

> Nothing in this [Act] shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this chapter.

20 U.S.C. § 7907(a).

## B.    Relevant Regulations Under the Act

Congress empowered the Secretary to "issue such regulations as are necessary to reasonably ensure that there is compliance" with the Act's provisions.  *See* 20 U.S.C. § 6571.  On July 5, 2002, within the six-month time-period mandated by 20 U.S.C. § 6578, the former Secretary of Education, Rod Paige, issued final regulations implementing the Act.   *See* Improving the Academic Achievement of the Disadvantaged, 67 Fed. Reg. 45038, 45041-42 (July 5, 2002); 34 C.F.R. §§ 200.2, 200.6.  These regulations emphasize that the Act requires States to test special education students (a specific subset of "students with disabilities") and LEP students at grade-level standards; in other words, the regulations do not permit out-of-level testing for these students.[5]  *See* 67 Fed. Reg. at 45038, 45040-42; 34 C.F.R. §§ 200.2(b), 200.6(a)(1).

---

[5]    The regulations revised 34 C.F.R. § 200 to provide in § 200.2(b) as follows: "The assessment system required under this section must . . . (1) Be the same assessment system used to measure the achievement of all students in accordance with § 200.3 or § 200.4. . . . (2) Be designed to be valid and accessible for use by the widest possible range of students, including students with disabilities and students with limited English proficiency. . . . (3)(i) Be aligned with the State's challenging academic content and student academic achievement standards . . . ."  67 Fed. Reg. 45040.  The Secretary also revised 34 C.F.R. § 200.6 to provide that "[a] State's academic assessment system required under § 200.2 must provide for the participation of all students in the grades assessed,"  67 Fed. Reg. 45041, and "do not permit an exemption from participating in the State assessment system for limited English proficient students," 67 Fed. Reg. 45042.  *See also* 67 Fed. Reg. 45044-45 (responding to comments to the regulations and stating that "the statute does require that all students be held to the same achievement standards").

On August 6, 2002, Secretary Paige then proposed regulations that would permit the use of alternate assessments for students with the "most significant cognitive disabilities." Improving the Academic Achievement of the Disadvantaged, 67 Fed. Reg. 50986, 50987 (Aug. 6, 2002). He stated that "alternate assessments are an appropriate way to measure the progress of only that very limited portion of students with the most significant cognitive disabilities who will never be able to demonstrate progress on grade level academic achievement standards even if provided the very best possible education" and that these alternate assessments would not apply to "more than 0.5 percent of all students in the grades assessed." *Id.* at 50987, 51005. In the final regulations issued on December 2, 2002, however, the Secretary did not adopt the alternate assessment proposal. Rather, the regulations required that the "same grade level academic content and achievement standards" be applied to "alternate assessments," but Secretary Paige added that he would "propose an exception to this policy for a small group of students with disabilities." Improving the Academic Achievement of the Disadvantaged, 67 Fed. Reg. 71710, 71711 (Dec. 2, 2002). He issued this proposed exception on March 20, 2003, suggesting that students with the "most significant cognitive disabilities," estimated to be only approximately one percent of the entire student population, be tested using alternate assessments. *See* Improving the Academic Achievement of the Disadvantaged, 68 Fed. Reg. at 13797-98; *see also* State's Mot. for J. on R. [doc. # 133], Ex. B ("June 27, 2003 Policy Letter") (stating same). In December 2003, the Secretary issued regulations adopting the one percent exemption from testing. *See* Improving the Academic Achievement of the Disadvantaged, 68 Fed. Reg. 68698, 68700-01 (Dec. 9, 2003); 34 C.F.R. §§ 200.1(d), 200.6(a)(2).[6] In doing so, the Secretary

---

[6] The alternate achievement standards and assessments for this population must meet certain criteria set forth in 34 C.F.R. § 200.1(d).

stated that "[i]n order to improve instruction and achievement for all students with disabilities, the Department expects States to assess as many students as possible with academic assessments aligned to regular achievement standards."  68 Fed. Reg. at 68700.

Following publication of the final regulations, on December 3, 2004, Congress passed legislation – the Individuals with Disabilities Act (the "IDEA"), 20 U.S.C. § 1412 (2006) – that statutorily adopted the one percent exemption that was contained in the Secretary's final regulations. The IDEA specifically allows local educational agencies to "measure the achievement of children with disabilities" against "alternative academic achievement standards permitted under the regulations promulgated to carry out section 6311(b)(1)" of the Act.  20 U.S.C. § 1412(a)(16)(C)(ii)(II).[7]  In a policy letter issued on May 10, 2005, Secretary Spellings discussed the one percent exemption, stating:

> [I]n the past, [students with disabilities] have often been held to lower standards and assessed in ways that failed to accommodate their disabilities and demonstrate what they know.  As a result, I support emphatically the requirements that are the cornerstone of [the Act]: that *all* students, including students with disabilities, be held to challenging content and achievement standards; that their progress be measured annually by high-quality assessments aligned with those high standards; and that school districts be held accountable for achieving results.

A.C.A.R. [doc. # 132], Tab 5 ("Policy Guidance including Guidance regarding Students with Disabilities (amended pursuant to May 17, 2007 Court Order)) (emphasis added).

The Secretary also provided  further guidance on the Act's requirements for assessing LEP

---

[7]  More recently, the Secretary adopted modified achievement standards, which the Secretary says allow for modification of "content mastery . . . , but not the grade-level content standards on which those expectations are based."  Cross-Mot. for J. on R. [doc. # 145], at 8; *see* 34 C.F.R. § 200.1(e); Improving the Academic Achievement of the Disadvantaged; Individuals With Disabilities Education Act (IDEA)--Assistance to States for the Education of Children With Disabilities, 72 Fed. Reg. 17748 (Apr. 9, 2007).

students. On February 20, 2004, Secretary Paige issued a policy statement commenting that "additional flexibility is needed to ensure that NCLB supports and improves the educational opportunities for all students, especially [LEP] students." A.C.A.R. [doc. # 132], Tab 26. Later, in June 2004, Secretary Paige published proposed regulations, *see* Improving the Academic Achievement of the Disadvantaged, 69 Fed. Reg. 35462, 35463, 35465 (June 24, 2004), which provided, in relevant part, that States "may exempt a recently arrived student from *one* administration of the State's reading/language arts assessment under § 200.2," but must still assess these students in English language proficiency and mathematics. *See* 69 Fed. Reg. at 35465 (emphasis added). The June 2004 LEP proposed regulations were based in part on the recognition that "taking a State's reading/language arts assessment, even with accommodations, requires a certain level of English language expertise." *Id.* at 35463. Later, on September 13, 2006, Secretary Spellings issued the final set of regulations regarding LEP students. The final regulations, in pertinent part, allowed States to exempt LEP students from a State's reading/language arts assessments for their first year in school in the United States. *See* 34 C.F.R. § 200.6(b)(4); Improving the Academic Achievement of the Disadvantaged, 71 Fed. Reg. 54188 (Sept. 13, 2006). In responding to suggestions that the exemption should be extended, the regulations stated:

> [I]t was important to have a time limit to ensure that the one-time exemption is used only for LEP students who have recently arrived in schools in the United States, not for those students who have lived in the United States for a number of years and attended United States schools but who still possess limited proficiency in English. . . . [T]he purpose of the regulations is to afford [local educational agencies] time to provide instruction in English as well as content to recently arrived LEP students to prepare them to take the State's assessment in reading/language arts the following year. . . . The Secretary recognizes that the LEP subgroup is one whose membership can change from year to year as students who have attained English proficiency exit the subgroup and new students not proficient in English enter the subgroup.

71 Fed. Reg. at 54190.

## C. Connecticut's Proposed Plan Amendment

On March 31, 2005, following the submission of Connecticut's plans and correspondence discussing the requirements for LEP[8] and special education students,[9] the State submitted two proposed plan amendments regarding the timing and method of assessment for LEP and special education students. The proposed plan amendments sought: (1) to assess special education students at instructional, rather than grade, level, when deemed "most appropriate"; and (2) to exempt recently arrived LEP students from testing for three years. *See* A.C.A.R. [doc. # 132], Tab 13 at 127-32. Specifically, the proposed plan amendment regarding special education students stated: "We request that we be allowed to return to our practice of testing special education students at their instructional level when their planning and placement teams determine that this is *most appropriate*." *Id.*, Tab

---

[8] The State initially proposed that LEP students be exempted from the assessment requirement, but the Secretary denied this proposal. *See* A.C.A.R. [doc. # 132], Tab 31 at 342. The State then submitted a revised plan providing that "[e]ffective September 2003, all LEP students will participate in the state assessments, with or without accommodations . . . ." *Id.*, Tab 31 at 345. In October 2003, the State again noted that it had suggested that the Secretary allow a reasonable amount of time for LEP students to adjust to schools in the United States and English, but that suggestion was rejected by the Secretary. *See id.*, Tab 30 at 306, 308, 311, 314-15. In August 2004, the State submitted a plan that would have allowed recently arrived students to be exempt from testing in their first year, though such exempted students were required to take English proficiency tests. *See id.*, Tab 23 at 248. Finally, on January 14, 2005, the State's Commissioner of Education, Dr. Betty Sternberg, wrote to the Secretary requesting that LEP students be exempt from testing for three years. *See id.*, Tab 20 at 194. In her February 28, 2005 response, the Secretary denied the request, and added that "final regulations are forthcoming that allow recently arrived LEP students a year to adjust to the educational system before needing to be assessed in reading/language arts . . . ." *Id.*, Tab 17 at 182, but also noted that the Secretary would "not waiver [sic] in the implementation of the NCLB annual testing provisions." *Id.*, Tab 17 at 181.

[9] In her January 14, 2005 letter to the Secretary, Commissioner Sternberg requested that the State be allowed to return to out-of-level testing for special education students when deemed most appropriate, *see* A.C.A.R. [doc. # 132], Tab 20 at 194, but the Secretary denied that request, *see id.*, Tab 17 at 182.

13 at 130 (emphasis added). As to LEP students, the proposed plan amendment read: "Connecticut . . . proposes a reasonable length of time, *three years*, for [LEP] students to be in our schools before we test them in reading, math and science." *See id.*, Tab 13 at 129 (emphasis added).

After the State's requests had been submitted but before the Secretary had responded to them, the Secretary announced that she would be more flexible in implementing the Act and publicly stated that up to two percent of the student population might have "academic disabilities" and thus may be more appropriately tested using alternative assessment instruments. *See id.*, Tab 5 at 33; Tab 11 at 121. The State then submitted additional letters reiterating its previous request that it be allowed to return to its previous testing practices and welcoming the expected two percent student exemption, but noting some concern with the Secretary's intention to link the alternate assessments of these students to grade-level testing. *See id.*, Tab 4 at 30, Tab 8 at 51. On May 27, 2005, Connecticut submitted an updated plan amendment and waiver request letter. *See id.*, Tab 3. Under the "amendment" section, the State's letter reiterated its March 31, 2005 LEP proposed plan amendment, and under the "waiver" section, sought to exempt special education students when deemed most appropriate, which it apparently calculated would occur with up to two percent of the special education students. *See id.*, Tab 3 at 14.

On June 20, 2005, the Secretary denied the State's proposed plan amendments regarding LEP and special education students, because they did "not comply with the statute and regulations." *Id.*, Tab 1. Under a heading labeled "Amendments that are not fully aligned with the statute and regulations," the Secretary reiterated that the proposed plan amendments "do not comply with the statute and regulations." *Id.*, Tab 1 at 2. As to the request to test special education students at grade level, the Secretary wrote:

Connecticut requests to assess students with disabilities at instructional levels when deemed most appropriate. The statute and regulations do not allow for students with disabilities to be tested at instructional levels. The only exception to grade-level achievement standards is the authority in the regulations to hold students with the most significant cognitive disabilities to alternate achievement standards.

*Id.*, Tab 1 at 2. Regarding the LEP request, the Secretary stated, "Connecticut requests to exempt recently arrived LEP students for three years from mathematics, reading, and writing assessments. Current policy on this issue allows recently arrived LEP students one year before taking the reading assessment." *Id.*, Tab 1 at 3.

## II.

The State now appeals from the Secretary's denials of these proposed plan amendments. In its Motion for Judgment on the Administrative Record [doc. # 133], the State asserts three reasons why the Court should set aside the Secretary's denials: (1) the Secretary failed to provide the State with a hearing in violation of the Act, thus violating the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(D); (2) the Secretary's decision regarding the State's proposals for LEP and special education students is arbitrary and capricious and thus violates the APA, 5 U.S.C. §§ 701-706; and (3) the Secretary misinterpreted and misapplied 20 U.S.C. § 7907(a), the "Unfunded Mandates Provision."

In her Cross-Motion for Judgment on the Record [doc. # 145], the Secretary asks the Court to find that the State's procedural complaints are foreclosed by this Court's Motion to Dismiss Ruling or that the Secretary gave the State whatever process was due; that the Secretary did not act arbitrarily or capriciously in denying the State's proposed plan amendments; and that the State's claims regarding

the Unfunded Mandates Provision are not properly before this Court or were waived, or in any case, that the Secretary's interpretation of that provision is correct. *See* Cross-Mot. for J. on R. [doc. # 145]. In its Cross-Motion, the Connecticut NAACP takes no position on the State's procedural complaint; however, it opposes the State's second and third grounds for reversal. *See* NAACP's Cross-Mot. for J. on R. and Opp'n to Pls.' Mot. for J. on R. [doc. # 142], at 1-2.

## A.   Hearing

The State's first asserted ground for reversing the denials of the proposed plan amendments is entirely procedural. In its brief, the State argues that in denying its proposed plan amendments, the Secretary failed to provide the State with a hearing, in violation of 20 U.S.C. § 6311(e)(1)(E). *See* State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 5. The State argues that the Act's prohibition against denying State's plans without a hearing, *see* 20 U.S.C. § 6311(e)(1)(E)(iii), extends to plan *amendments* as well, and that by failing to provide a hearing, the Secretary did not observe the "procedure required by law," a ground for setting aside an agency's action under the APA, 5 U.S.C. § 706(2)(D). *See also* 34 C.F.R. § 76.202 ("The Secretary may disapprove a State plan only after: (a) Notifying the State; (b) Offering the State a reasonable opportunity for a hearing; and (c) Holding the hearing, if requested by the State.").

The Court had thought that this issue was previously resolved. In its Motion to Dismiss Ruling, the Court explicitly addressed this argument as follows:

> That leaves the State's assertion in Count IV that it was denied a hearing on its proposed plan amendments in violation of 20 U.S.C. § 6311(e)(1)(E). In its Complaint, the State requests a declaratory judgment requiring the Secretary to "provide a hearing before she denies a plan amendment." *See* Compl. [doc. # 81] at 47. If the Secretary did in fact violate the Act by not providing the State with a hearing, the proper remedy would be a remand for the Secretary to hold a hearing. . . . However, in other portions of its Complaint and in its briefing to the Court, the

State has made it clear that it does not want the Court to remand the case to the agency for the hearing requested, but rather asks the Court to rule on the merits of the plan amendments. *Id.* at 46-48; State's Supplemental Br. in Supp. of Def.'s Mot. to Dismiss on Matters Raised During the Apr. 28, 2006 Oral Argument [doc. # 64] at 13-14 (arguing that pursuing the plan amendment process would be futile).

*Spellings*, 453 F. Supp. 2d at 502.   Accordingly, the Court held as follows:

Given that (1) the State does not seek a remand for the hearing to which it believes it is entitled; (2) the Secretary does not seek a remand; and (3) there are apparently no other plan amendments pending before the Secretary, *the Court dismisses the State's claim for violation of § 6311(e)(1)(E) as moot*. The Court emphasizes that in doing so, it does not reach the question of what would constitute a satisfactory hearing under § 6311(e)(1)(E). That determination is not necessary in this case. The Court therefore denies in part and grants in part the Secretary's Motion to Dismiss [doc. # 18] as to Count IV. The Court denies the Motion to Dismiss with respect to the State's claim that the Secretary's denial of its plan amendment violated the APA. *The Court grants the Motion to Dismiss as to the State's claim that the Secretary provided an inadequate hearing because that claim is now moot.*

*Id.* (emphasis added).

The State has never moved for reconsideration, or vacatur, of the Court's ruling. Indeed, the State did not raise this issue again until it filed its motion for judgment, approximately a year after the Court's Motion to Dismiss Ruling. The State says that while putting the administrative record together, it revisited the issue of the need for a hearing. However, the State does not say what it learned in that effort that it did not already know (or should have known) at the time it represented to the Court that it did not want a hearing. Accordingly, the Court is dismayed by the State's very late about-face on this issue.

But the Court's dismay fades quickly in the face of its puzzlement. Because at argument on the APA appeal, the State once again stated – as it had previously represented – that since the Secretary agrees that the State is entitled to APA review of the Secretary's decision to deny the State's proposed plan amendments and since those determinations were (as the Secretary acknowledges)

made on the basis of the statute and regulations only and not on the basis of educational policy considerations, there is no need for a remand or a hearing. Thus, as the State presents it, the question for the Court is purely one of law for which an administrative hearing is unnecessary. Even more puzzling, the State clarified at oral argument that its allegation of procedural deficiency is limited to the Secretary's asserted failure to give the State the opportunity to submit legal briefs demonstrating that the State's requests did, in fact, comply with the Act. Thus, the crux of the State's hearing complaint is that it was never *offered* the opportunity to submit statutory legal analysis. However, the State conceded at oral argument that it never requested the opportunity to submit such briefing, and more importantly, it was never denied such an opportunity. Indeed, the Secretary permitted the State to file numerous and lengthy submissions urging approval of the State's requests or objecting to the Secretary's decisions. Therefore, had the State truly wanted to submit a brief in response to the Secretary's decision, no one would have prevented it from doing so.[10] It is difficult to understand, therefore, what process the State believes it was denied.

In any event, since the State has once again stated that there is no need to remand for a hearing on the issues of law presented by the Secretary's denials, the Court declines to reach the hearing claim that the State now seeks to revive. If the Court needed to remand for consideration of educational policy issues – and it does not – it might be appropriate for the Court to consider what type of proceedings should occur on remand. Given the Court's decision on the remaining issues, however, there is no need for a remand and therefore, no need to address an issue that is, at best, of only hypothetical interest. As a consequence, the Court will not revisit its decision to dismiss the State's

---

[10] The State filed the current lawsuit in Federal Court three months after the denials of the proposed plan amendments. However, it did not raise the hearing issue until August 1, 2006, when it filed its Second Amended Complaint [doc. # 81], which included Count IV.

hearing claim. In doing so, the Court emphasizes that it has not considered, nor ruled on, the merits of the State's argument that 20 U.S.C. § 6311(e)(1)(E)(iii) extends to plan *amendments*, as well as state plans.

**B.    Review Under the Arbitrary and Capricious Standard**

As noted above, the Secretary has agreed that its decisions to reject the State's proposed plan amendments are reviewable under the APA and that they can be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). As previously rehearsed, the Secretary's June 20, 2005 letter denying the State's proposed plan amendments stated that the denied proposed plan amendments did "not comply with the statute and regulations." *See* A.C.A.R. [doc. # 132], Tab 1 at 1. Consistent with the letter, the Secretary has repeatedly represented to the Court that her decision to reject the State's proposed amendments was based solely on statutory requirements and not on considerations of educational policy. *See, e.g.*, Sec'y's Opp'n to Mot. for Leave to file Second Am. Compl. [doc. # 77] at 16 ("The decision to approve a plan amendment is based solely on whether the proposed amendments conform to the applicable statutory and regulatory requirements."); Sec'y's Mem. in Opp'n to Pl.'s Mot. Regarding the Admin. R. [doc. # 118] at 2, 3, 10; State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 15-23. Counsel for the Secretary reiterated this point during the January 4, 2008 oral argument.

Therefore, the Court wishes to emphasize that it is not faced with the issue of the wisdom of the Secretary's decisions or whether they will hinder, or advance, the educational achievement of Connecticut's LEP students or special education students. While the Court is certainly not an expert on educational policy, one could presumably make a decent argument that testing students who are newly arrived from foreign lands in English, when they are not at all proficient in English, may not

be a particularly sensible way to determine the level of the students' academic achievement or knowledge. One might mount a similar argument for testing special education students at grade level, rather than instructional level. But those are not the issues before this Court. The only question is whether the Secretary's denials of the State's requests on the ground that they were contrary to the statute was arbitrary and capricious. For the reasons set forth below, the Court concludes that it was not.

### 1.      Standard of Review

The State bears a heavy burden on this appeal since it must show that the Secretary's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .'" 5 U.S.C. § 706(2)(A). "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *See Fox Television Stations, Inc. v. FCC*, 489 F.3d 444, 454 (2d Cir. 2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court's authority to review agency action under the APA standard is narrow, and the court must ensure that it does not substitute its own judgment for that of the agency. *See id.*

Furthermore, the parties agree that legal review of an agency's "construction of [a] statute" is governed by the two-step inquiry established by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). The first step is to ascertain "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Chevron*, 467 U.S. at 842-43, *accord N.Y. Pub. Interest Research Group, Inc. v. Johnson*, 427 F.3d 172, 179 (2d Cir. 2005) ("[Courts do] not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent."). The second step of the *Chevron* inquiry instructs that if the statute is "silent or ambiguous . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843 (footnotes omitted); *accord Bell v. Reno*, 218 F.3d 86, 90 (2d Cir. 2000) ("[Courts must evaluate] whether the agency's answer is based on a permissible construction of the statute."). The Court must defer to the agency's construction of the statute "as long as that interpretation is reasonable." *Bell*, 218 F.3d at 90. After-the-fact rationalizations for agency interpretations are disfavored. *See Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 81 (2d Cir. 2006).

At oral argument, the Secretary asserted that the Act is clear and therefore no *Chevron* deference is due to the Secretary. The Court agrees. Thus, under the first step in the *Chevron* analysis, the Court must ascertain what the statute provides and whether the Secretary's finding that the Act bars Connecticut's proposed plan amendments was arbitrary and capricious.

## 2.    Special Education Students

The State's argument with respect to the provisions of the Act regarding special education students (and for that matter, LEP students) is quite straightforward. According to the State, even the Secretary must agree that the Act permits instructional-level testing for at least some special education students because the Secretary's 2003 regulations exempted from testing one percent of special education students. *See* State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 42 ("[I]t is apparent that as a matter of legal interpretation, the Secretary determined that the NCLB Act did not preclude the use of alternate assessments, and did not preclude the use of out-of-level testing."). The

State does not challenge the validity of that decision but instead argues that the Secretary's regulations show that the Act has flexibility and the only issue is what best achieves its goals – which is a decision grounded in educational policy, not the statute. According to Connecticut, the flexibility provided in the Act is demonstrated because the Act "requires 'all' student participation on one hand, and then sets forth separate statutory directives for special education student assessments, on the other. Although the Act provides for 'reasonable adaptations and accommodations' for students with disabilities, it is silent on the issue of alternative assessments." *See* State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 32. In short, the State argues that the Secretary acted arbitrarily, capriciously, and contrary to law because she cannot explain why the State's proposed plan amendment for special education students violates the Act, while the Secretary's one percent exemption does not. *See* State's Combined Reply Br. [doc. # 148], at 16.

The Secretary responds that the State's special education amendments "violated the statutory requirement that the same academic standards apply to all students in the state." Sec'y's Cross-Mot. for J. on R. [doc. # 145], at 1. And, she notes, the State "recognized this statutory requirement when it initially sought a waiver" from that requirement. *Id.*, at 1; *see also* A.C.A.R. [doc. # 132], Tab 20 at 193-95 (Jan. 14, 2004 letter requesting waiver), Tab 25 at 286-88 (Apr. 1, 2004 letter noting that out-of-level testing for special education students "require changes in legislation."). The Act, specifically 20 U.S.C. § 6311(b)(3)(C)(ix)(II), does require States to assist students with disabilities in taking these assessments by providing "reasonable adaptations and accommodations . . . necessary to measure the academic achievement of such students relative to State academic content and State student academic achievement standards." Sec'y's Cross-Mot. for J. on R. [doc. # 145], at 20. Further, she adds, the Act requires States to define the annual yearly progress in a way that separately

measures the achievement of students with disabilities. *See id.* at 20. However, there is no exception from the Act's directive that States develop grade-level assessments and that they "shall be the same academic standards that the State applies to all schools and children in the State." 20 U.S.C. § 6311(b)(1)(B).

The Secretary also disputes the relevance of her December 2003 regulations and in any event argues that the one percent exemption was embraced by Congress in the IDEA and that the exemption is much narrower than what the State sought in its plan amendment. The Secretary notes that the State's approach (even if capped at two percent of all students as suggested in its May 27, 2005 waiver request) exceeds the scope of the Secretary's 2003 regulations, which were subsequently affirmed by Congress in the IDEA of 2004. Thus, the Secretary argues that her "regulations are narrowly tailored to address a particular issue with respect to very small segments of the . . . students with disabilities populations; in contrast, the State's proposed plan amendment would eliminate Congress's requirement of annual grade-level testing of these students." Sec'y's Reply Brief [doc. # 151], at 5.

The Secretary did not act arbitrarily, capriciously, or contrary to law in concluding that the State's proposed plan amendments were contrary to the dictates of the Act. *See, e.g.*, *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 177 (2d Cir. 2006) (holding that the Department of Health and Human Services did not act arbitrarily and capriciously in implementing statutory requirement to adjust Medicare reimbursements to reflect differences in hospital wage levels across geographic areas). The very clear message of Congress in the text of the Act was that States should apply the same academic standards to all students – including special education students, who were a particular focus of congressional interest. The Act could not be clearer and nothing about the structure of its provisions suggests otherwise. *See, e.g, County of Nassau v. Leavitt*, 2008 WL 1836382, at *5, – F.3d –, –

(2d Cir. 2008) ("Statutory construction is a holistic endeavor. In interpreting statutes, this Court reads statutory language in light of the surrounding language and framework of the statute.") (quotation marks omitted) (collecting cases).

The Act requires states to adopt challenging academic content and achievement standards and apply the "same academic standards" to "all schools and children in the State." 20 U.S.C. § 6311(b)(1)(B). States must also develop assessments aligned to those standards and those "assessments shall . . . be the same academic assessments used to measure the achievement of all students." 20 U.S.C. § 6311(b)(3)(C)(I); *see also* 20 U.S.C. § 6311(b)(3)(C)(ix)(I) (providing that a State's academic assessments must provide for "the participation in such assessments of all students"). While the State can and must provide reasonable accommodations, as the Secretary's regulations confirm, the accommodations must be those "necessary to measure the academic achievement of the student relative to the State's academic content and academic achievement standards *for the grade in which the student is enrolled* . . . ." 34 C.F.R. § 200.6(a)(1)(i)(A) (emphasis added). As a consequence, the Secretary has repeatedly and consistently construed the Act to prohibit out-of-grade testing for students with disabilities. *See, e.g.*, 67 Fed. Reg. at 45038, 45044-45. Out-of-grade testing is inconsistent with the Act because, by definition, it does not measure mastery of academic content or achievement for the grade in which the special education students are enrolled and therefore, does not hold special education students to the same standards as *all* students. *See* 20 U.S.C. §§ 6311(b)(1)(B), 6311(b)(3)(C)(i)-(iii).

The State's proposal, by contrast, would allow local educational officials to assess special education students at instructional, rather than grade, level, when those officials deemed such testing "most appropriate," without any criteria other than possibly an overall cap of two percent. The

21

Secretary's 2003 regulations do not permit such an open-ended exemption. Nor do they confirm the "flexibility" the State sees in the Act. For whatever authority the Secretary had – or did not have – to adopt the 2003 regulations (a question on which this Court expresses no view), Congress enacted the exemption into law and did so well before the Secretary's ruling on the State's proposed plan amendment. Congress thus concluded that a special, limited exemption for children with the most profound cognitive disabilities should be a part of the Nation's statutory law. That Congress saw fit statutorily to authorize a specific exemption advanced by the Secretary only confirms that Congress did not intend to permit other exemptions, and certainly not an open-ended one such as that sought by the State in its proposed plan amendment.

Of course, the Act authorizes the Secretary to grant waivers from the Act's requirements in certain circumstances. And indeed, the State sought such a waiver (perhaps reflecting, as the Secretary argues, the fact that the State, too, understood the Act to require grade-level testing for all special education students). It may well be – as the State argues – that sound educational policy supports such a waiver request. But as described in the Court's Motion to Dismiss Ruling, the Secretary denied the State's waiver request, and the Court has concluded (until instructed otherwise by the Second Circuit) that the Secretary's decision is not reviewable in this Court. *See Spellings*, 453 F. Supp. 2d at 494-501.

### 3. LEP Students

The State also argues that the Secretary's denial of the State's proposed plan to exempt recently arrived LEP students from testing for three years was arbitrary, capricious, and contrary to law. First, the State argues (as it did for special education students) that by proposing a one-year exemption for reading/language assessments for recently arrived students in her June 2004 LEP proposed

regulations, *see* 34 C.F.R. § 200.6(b)(4), the Secretary recognized that the Act allows for flexibility. *See* State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 20 ("The Secretary's statutory interpretation [as described in the June 2004 LEP proposed regulations] clearly did not hinge upon the length of time exempted – rather, it appeared to hinge upon the other assessments implemented during the exemption period. Thus, there is no statutory impediment to the approval of the State's LEP student assessment plan amendment"). Second, the State contends that the Act's LEP student assessment provisions and the overall structure of the Act permit the State's LEP request. As the State reads the Act, the statutory requirement for "'separate measurable annual objectives for continuous and substantial improvement' is distinct between 'all students,' on one hand, and specific subgroups, including LEP students, on the other." State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 14; *see* 20 U.S.C. § 6311(b)(2)(C)(v). And, the State adds, although the Secretary's letter denying the State's proposed plan amendment noted that it was not aligned with the Act, the letter also described her then one-year exemption as her "current policy." According to the State, it was only after litigation commenced that the Secretary focused on the statute as the basis for denying the State's proposal, supposedly revealing that the State's proposal was denied on policy, not statutory, grounds. *See* State's Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 28.

The Secretary reiterates that she denied the State's proposed plan amendment for LEP students because it "did not meet the requirement of the [Act] that all students be assessed . . . ." Sec'y's Cross-Mot. for J. on R. [doc. # 145], at 1. The references to "valid and reliable manner" and "reasonable accommodations on assessments," the Secretary says, apply to the way in which LEP students are tested, not to whether they should be tested at all. *See id.* at 18. Thus, such accommodations might include use of bilingual dictionaries, or additional time, or the use, as explicitly provided for in 20

23

U.S.C. § 6311(b)(3)(C)(ix)(III), of testing in the student's first language for the first three years (at which point, the Act envisions that they will achieve English language proficiency and after which they are to be tested annually in English under 20 U.S.C. § 6311(b)(3)(C)(x)). *See id.* Finally, as was true with the State's special education request, the Secretary points out that Connecticut sought a waiver precisely because the State recognized that the Act prohibited the State's proposal. *See id.* at 1.

The Secretary's denial of the State's proposed plan amendment for LEP students was not arbitrary, capricious, or contrary to law because a three-year exemption for LEP students flies in the face of the Act's explicit requirement that LEP students must be tested annually. Thus, 20 U.S.C. § 6311(b)(3)(C)(ix)(I) expressly requires States to provide for "the participation in [its] assessments of all students." Section 6311(b)(3)(C)(ix)(III) also provides that a State's assessments "shall" provide for "the inclusion of limited English proficient students, who shall be assessed in a valid and reliable manner and provided reasonable accommodations on assessments," including assessments in their native language. 20 U.S.C. § 6311(b)(3)(C)(ix)(III). That the Act provides that LEP students must be tested with tests written in English "once they have attended schools in the United States for three years" only further confirms that the Act contemplates testing of LEP students before the three-year mark proposed by the State.

And contrary to the State's argument, nothing in the structure of the Act permits the Court to conclude that a State may treat LEP students differently from non-LEP students, except as expressly provided in the Act, or to decline to test LEP students at all for the first three years after their arrival in the United States. Put a different way, the Act does have special provisions for LEP (and special education) students and does require States to accommodate those students, but not by exempting them entirely from testing for three years (or in the case of special education students, testing them

at instructional, rather than grade, level). LEP (and special education) students require reasonable accommodations, not no tests (or different tests).

The one-year exemption adopted by the Secretary does not suggest otherwise. As is made clear from the history of the Secretary's regulations, schools faced difficult decisions on when to test newly-arrived students. Some may have come to the United States a day before the test was administered; some may have arrived eleven months earlier. Given the fact that LEP students arrive at all times of the year, a decision needed to be made as to whom and when to test. The Secretary, who is authorized to issue "such regulations as are necessary to reasonably ensure that there is compliance" with the Act, 20 U.S.C. § 6571, decided to set a fixed date that every State could use to determine when a newly-arrived LEP student needed to take the annual assessments. Her choice for that line between those who needed to be tested and those who did not was one year, because the Secretary concluded that it was "unfair to hold schools accountable for newly arrived LEP students who have been educated in the U.S. for less than twelve months." Sec'y's Cross-Mot. for J. on R. [doc. # 145], at 19. The Secretary's transitional rule about effective dates for testing LEP students was certainly not an admission that the Act is flexible enough to exempt LEP students from all testing for three years. Rather, it was an attempt to reasonably ensure compliance with the Act in accordance with the Secretary's explicit statutory responsibility, 20 U.S.C. § 6571. As such, the transitional rule does not undermine the Secretary's position that the State's proposed plan amendment is contrary to the terms of the Act.

Finally, the Court rejects the State's argument that the Secretary's mention of "policy" in her June 20, 2005 letter shows that her decision was not based on the statute, but rather on educational policy. The Secretary rejected both of the State's proposals under a heading labeled "Amendments

that are not fully aligned with the statute and regulations." A.C.A.R. [doc. # 132], Tab 1 at 2. It is true that in discussing the denial of the LEP proposal, the Secretary's letter states that "*[c]urrent policy* on this issue allows recently arrived LEP students one year before taking the reading assessment . . . ." *Id.* (emphasis added). That language does not cause this Court to conclude that the Secretary denied the State's LEP request on the basis of policy choices and not the statute. By placing that reference under the above heading, the Secretary's letter denying the State's proposed plan amendments makes it clear that the Secretary's decision was statutory- rather than policy-based. The references to "current policy" in the letter were to the Secretary's regulation allowing for the one-year testing transition period and not to the basis of the Secretary's decision on the State's proposed plan amendments. The Court's interpretation of the Secretary's letter is also consistent with the Secretary's repeated representations to the Court.

## C. Unfunded Mandates

The State's final challenge to the Secretary's decisions to deny the State's proposed plan amendments focuses on the Secretary's interpretation of the Unfunded Mandates Provision, 20 U.S.C. § 7907(a). Emphasizing that it does not seek to challenge the substantive requirements of the Act, the State nonetheless argues that it is "challenging how the Secretary has chosen to implement certain portions of the Act without any consideration of the limits placed upon her by the express and explicit language of the Unfunded Mandates Provision." State's Combined Reply Br. [doc. # 148], at 17. The State interprets the Unfunded Mandates Provision to mean that "the federal government cannot oblige the State or localities to spend their own funds to meet the requirements of the NCLB Act" and asserts that the Secretary's decisions on the proposed plan amendments require the State to spend funds and incur costs not paid for under the Act, in violation of the Unfunded Mandates Provision. *See* State's

Mem. in Supp. of Mot. for J. on R. [doc. # 133-4], at 52. While the Secretary disagrees with the State's interpretation of the Unfunded Mandates Provision,[11] her principal retort is that this issue was never presented to the Secretary in connection with her decisions on the proposed plan amendments and therefore the issue is not properly before this Court. *See* Sec'y's Cross-Mot. for J. on R. [doc. # 145], at 2, 24.

In its ruling on the Secretary's Motion to Dismiss, this Court expressly declined to decide what issues the State could present in connection with its administrative appeal of the Secretary's decision on the State's proposed plan amendments. *See Spellings*, 453 F. Supp. 2d at 502. Instead, this Court said that it would "make that determination only after reviewing the administrative record on the State's plan amendment appeal." *Id.* Having now reviewed with care the administrative record, the Court has no doubt that the very important issue of the proper interpretation of the Unfunded Mandates Provision is not before this Court.

The State contends that it put the Secretary on notice that any decision to deny the State's proposed plan amendments would violate the Unfunded Mandates Provision in the following ways. First, the State reports that it "attached . . . and/or referenced," to its proposed plan amendments, the state statute enacted to comply with the Act, which stated that "any costs of such conformance to the state and local or regional boards of education that are attributable to additional federal requirements of the [Act] shall be paid exclusively from federal funds received [pursuant] to the [Act]." Conn. Gen. Stat. § 10-14n(g) (later amended, *see* Pub. L. No. 06-13, Second Am. Compl. [doc. # 81], ¶ 16); *see* State's Combined Reply Br. [doc. # 148], at 19 (citing A.C.A.R. [doc. # 132], Tab 23 at 221, 232;

---

[11] The NAACP also objects to the State's interpretation of the Unfunded Mandates Provision. *See* NAACP's Cross-Mot. for J. on R. and Opp'n to Pls.' Mot. for J. on R. [doc. # 142], at 2.

Tab 30 at 333; Tab 31 at 362). Second, and relatedly, the State asserts that in compliance with § 10-14n(g), it included with one of its submissions a report entitled "Cost of Implementing the Federal No Child Left Behind Act in Connecticut," which estimated an overall NCLB funding shortfall of $41.6 million over time and segregated the costs for LEP and special education assessments. *See* State's Combined Reply Br. [doc. # 148], at 19-21 (citing A.C.A.R. [doc. # 132], Tab 16 at iv-v, 156-57, 159, 173, 175). The State points out that the report was "issued, discussed and adopted by the State Board of Education at the same meeting attended by Deputy Commissioner Raymond Simon," *id.* at 20, and that a letter the next day from Commissioner Sternberg noted "concerns about the cost of implementing [the Act]," *id.* (citing A.C.A.R. [doc. # 132], Tab 14 at 144). Third, the State cites newspaper articles relating to the unfunded mandates issue, which the State included in its March 31, 2005 formal request for plan amendments. *See id.* at 21 (citing A.C.A.R. [doc. # 132], Tab 13 at 136, 138-39). Fourth, the State contends that it "vetted [the issue of inadequate funding] in correspondence between the Commissioner and the Secretary." *Id.* (citing A.C.A.R. [doc. # 132], Tab 6, at 46-48, Tab 4 at 28-30). Indeed, the State asserts that it "repeatedly raised the issue of insufficient funding." *Id.* at 19. And in that regard, the State contends that it "proposed solutions for complying with the Act . . . that would be cost neutral." *Id.* at 21.

As the U.S. Supreme Court noted long ago, "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts." *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952):

> Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative

> decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

*Id.*; *accord Am. Short Line R.R. Assoc. v. United States*, 751 F.2d 107, 116 (2d Cir. 1984) (refusing to consider issue not raised before administrative agency); *Nuclear Energy v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."); 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 8398, at 397-403 (2d ed. 1995) ("One challenging an agency decision must exhaust all administrative remedies before seeking judicial review. . . . Statutes and judicial interpretation define the scope of the exhaustion doctrine. . . . The exhaustion doctrine also covers the situation where one fails to adequately present an argument or issue to the agency before seeking review."). Further, "'the issue must be raised with *sufficient specificity and clarity* that the tribunal is aware that it must decide the issue, and in sufficient time that the agency can do so.'" *Kachanis v. Dep't of Treasury*, 212 F.3d 1289 (Fed. Cir. 2000) (quoting *Wallace v. Dep't of the Air Force*, 879 F.2d 829, 832 (Fed. Cir. 1989)) (emphasis added); *see also Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 321 n.1 (2d Cir. 2006). This is a standard that the State simply has not met.

As an initial matter, it is clear that in not a single one of the many letters or submissions sent in support of the State's proposed plan amendments did the State ever claim or argue that denials of the State's proposed plan amendments would violate the Unfunded Mandates Provision. Nor do any of the State's plan amendment submissions explain to the Secretary what portion of the Secretary's special education or LEP "mandates" would be unfunded.[12] Though Connecticut provided estimates

---

[12] By contrast, the State's requests to test students in every other year (discussed in *Spellings*, 453 F. Supp. 2d at 478-79, 501) did rely on the additional cost of testing students every year. *See*

of what it would cost to modify and implement assessment policies and accommodations for LEP students and to develop alternate assessments for students with disabilities, *see* A.C.A.R. [doc. # 132], Tab 16 at 156, 158-59, 173, nowhere did it state that the federal funding was insufficient to cover those costs. Instead, the State sought to justify its requests on the basis of reasons other than cost. *See id.*, Tab 13 at 128-30; Tab 3 at 14.[13] Not surprisingly, therefore, the Secretary's letter denying the State's proposed plan amendments makes no reference to the Unfunded Mandates Provision. Nor did the State ever ask the Secretary to reconsider her decision on that basis or to address their supposed unfunded mandates argument.

As the Secretary points out, *see* Sec'y's Reply Brief [doc. # 151], at 7, raising the general issue of "insufficient funding" is not the same as arguing that a decision to deny the State's proposed plan amendments would violate the Unfunded Mandates Provision. Nor does attaching state statutes, reports, and newspaper articles that generally address the issue of funding sufficiently alert the

---

A.C.A.R. [doc. # 132], Tab 13, at 127, 133; Tab 4 at 29.

[13] The State's January 2005 LEP waiver request stated: "Next, while the U.S. Department of Education is telling the states they can test English language learners in their primary language, the logic and effectiveness of this approach is questionable. Approximately 160 languages are spoken as the primary language in the homes of Connecticut students; the cost of developing alternative tests would be in the tens of millions of dollars. Limiting the development of alternative testing to the most frequently spoken language – Spanish, spoken by a significant majority of our non-English speakers – would limit the cost but create justified equity questions. Let us suppose, however, that it were economically feasible to develop assessments in all other primary languages. If the ultimate goal is to ensure the English language and literacy skills of all students, testing students in their non-English primary language would miss the point. So, too, would testing students in English the first day they come to the United States and enter our schools. Our proposal is that there be a reasonable length of time – in our view, three years – for students to be in our schools learning English before being tested in English in reading, math and science." A.C.A.R. [doc. # 132], Tab 20 at 194.

Secretary that denial of the particular plan amendments before her would violate the Unfunded Mandates Provision. Indeed, in many of the instances in which the State asserts that it references Connecticut General Statute § 10-14n(g), the State actually makes reference to other sections of that statute that have nothing to do with funding. *See* A.C.A.R. [doc. # 132], Tab 23 at 221, 232. Moreover, all of the purported references to § 10-14(g) are buried within lengthy reports. *See* A.C.A.R. [doc. # 132], Tabs 23, 30, 31. Further, the newspaper articles that are attached appear to assume that the State would be expected to contribute towards the expenses of implementing the Act and bemoan the added cost to Connecticut of complying with the Act. *See* A.C.A.R. [doc. # 132], Tab 13 at 136-39 ("[T]he federal government has enacted a new law, NCLB, which is grossly underfunded, and which will require our Department of Education to spend an additional $41 million annually in state money to meet the requirements of the law . . . ."). In short, a reasonable person could not conclude from the State's submissions that it had raised the unfunded mandates issue with sufficient specificity and clarity that the Secretary was aware that she must decide the issue in order to rule on the State's proposed plan amendments..

Courts faced with analogous situations have come to similar conclusions. For instance, in *Wallace*, the Federal Circuit was faced with the question of whether the petitioner had sufficiently raised with the administrative judge the validity of performance standards used to assess the petitioner. The court held that petitioner had not done so, because her purported attempts to raise this issue were limited to one instance in which she raised the objectivity of the performance standards, but only as to a specific issue; another in which she cited to the relevant statute and regulations without a corresponding statement; and other instances in which she raised the issue to parties other than the administrative judge or Board or after the administrative judge would have had an

opportunity to request evidence and consider the issue. *See Wallace*, 879 F.2d at 832-33. Also, in

*Yahle v. Office of Pers. Mgmt.*, No. 01-3285, 2002 WL 378088, at *3-*4 (Fed. Cir. Mar. 11, 2002),

the Federal Circuit found that the petitioner did not sufficiently raise the issue of her effective starting

date because though she mentioned the subject in a single statement in pretrial submissions, she failed

to respond to the administrative judge's invitation to choose one of two potentially applicable dates

and thus had abandoned that claim. Similarly, in *Xiao Ji Chen*, the Second Circuit refused to consider

the petitioner's argument that the birth of additional children in the United States excused the

untimeliness of her application because although she raised that issue before the Board of

Immigration Appeals, she did so "*not* as evidence of changed circumstances excusing an untimely

asylum application . . . but rather, as further evidence establishing her alleged 'well-founded fear of

persecution.'" 471 F.3d at 321 n.1; *cf. Kachanis*, 212 F.3d at 1294 (finding issue preserved where

described in pretrial submissions, closing brief, and closing remarks to the administrative judge, and

raised before the Board).

The Court wishes to be clear that it has not ruled on the merits of the State's Unfunded

Mandates Provision claim because the argument was never made in connection with these two

proposed plan amendments. Therefore, the State is free to pursue that issue before the Secretary. It

is truly unfortunate that the Court is unable to reach this issue because the State failed adequately to

raise it in the context of the State's proposed plan amendments. For immediately after the Court's

ruling on the Secretary's Motion to Dismiss, the Court suggested to the State that it consider

dismissing Count IV without prejudice in order to allow the State to return to the Secretary to develop

a detailed record regarding the State's unfunded mandates argument. Instead, the State decided to

continue to litigate the issue in this Court. Regrettably, the result is that over a year and one-half after

the Motion to Dismiss Ruling, the State is no closer to a determination of this very important issue.

**III.**

For the reasons detailed above, the Court GRANTS the Secretary's Cross-Motion for Judgment on the Record [doc. # 145], GRANTS the NAACP's Cross-Motion for Judgment on the Record and Opposition to Plaintiff's Motion for Judgment on the Record [doc. # 142] and DENIES the State's Motion for Judgment on the Administrative Record [doc. # 133]. **The Clerk should enter a final judgment in favor of the Secretary and the NAACP and against the State on all counts of its Second Amended Complaint [doc. # 81] and close this file.**

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: April 28, 2008.**